BOSTON CHILDREN'S HEART
FOUNDATION, INC.,
Plaintiff–Appellee,

v.

Bernardo NADAL–GINARD,
Defendant–Appellant.

BOSTON CHILDREN'S HEART
FOUNDATION, INC., Plaintiff–
Appellant,

v.

Bernardo NADAL–GINARD,
Defendant–Appellee.

Nos. 95–1053, 95–1136.

United States Court of Appeals,
First Circuit.

Heard Aug. 4, 1995.

Decided Jan. 12, 1996.

Laura Steinberg, with whom Cynthia M. Clarke, Katherine J. Ross, Lisa F. Sherman and Sullivan & Worcester, Boston, MA, were on brief, for Bernardo Nadal–Ginard.

Alexander H. Pratt, Jr., with whom Paul R. Devin, James H. Belanger, Robin E. Folsom, William M. Cowan and Peabody & Ar-

nold, Boston, MA, were on brief, for Boston Children's Heart Foundation, Inc.

Before SELYA and BOUDIN, Circuit Judges, and LISI,[*] District Judge.

MARY M. LISI, District Judge.

## I. INTRODUCTION

These appeals present us with the classic tale of a corporate officer who, when caught using corporate funds for personal gain, resists making amends for his misdeeds. In this instance, Dr. Bernardo Nadal–Ginard was alleged to have misappropriated the funds of the corporation of which he had served as both an officer and director, the Boston Children's Heart Foundation ("BCHF"). Following an eighteen-day bench trial, the district court found that Nadal–Ginard violated his fiduciary duties to BCHF, and entered judgment in its favor in the amount of $6,562,-283.02. Notwithstanding allegations of error by both parties, we affirm the district court's decision.

## II. BACKGROUND

Plaintiff-appellee BCHF is a non-profit corporation organized for the purposes of conducting medical research in the field of cardiology and providing medical services to patients at Boston Children's Hospital ("Hospital"), a teaching hospital affiliated with Harvard Medical School ("Medical School"). The defendant-appellant, Nadal–Ginard, was the president and a member of the Board of Directors of BCHF ("Board"). Nadal–Ginard was also Chairman of the Department of Cardiology ("Department") at the Hospital, as well as a member of the faculty of the Medical School.

Nadal–Ginard first became associated with these entities in 1982, when he accepted the chairmanship and faculty position. Approximately one year later, with the assistance of Boston attorney Douglas Nadeau, BCHF, a tax-exempt Massachusetts corporation created to conduct the Department's clinical activities, was organized.[1] Like the other departments' corporations, the Operating Agreement between the Hospital and BCHF explicitly acknowledged the independent status of the foundation. Indeed, control of the foundation was given to BCHF's three directors: Nadal–Ginard, Donald Fyler, and Michael Freed.[2] Nadal–Ginard also served as president of BCHF until 1993, when the circumstances leading to this litigation began to surface.

In addition to his duties at the Hospital, Medical School, and BCHF, Nadal–Ginard accepted a position as an investigator with the Howard Hughes Medical Institute ("HHMI") in 1986. In this position, he directed the activities of the Howard Hughes Medical Institute Laboratory of Cellular and Molecular Cardiology at the Hospital. Nadal–Ginard received a substantial salary and some optional fringe benefits as compensation for his services.

There were never any questions as to Nadal–Ginard's qualifications as a scientist and a physician. Several questions did arise, however, with respect to certain actions Nadal–Ginard took with respect to setting his salary, establishing a severance benefit plan, and using BCHF funds for personal expenses. On November 12, 1993, BCHF filed suit claiming that Nadal–Ginard breached his fiduciary duties to the corporation.[3] Following a bench trial, the district court found most of the allegations to be true and awarded damages to BCHF.

---

[*] Of the District of Rhode Island, sitting by designation.

[1] In 1980, the Hospital's Board of Trustees had adopted a Group Practice Policy Statement which permitted the Hospital's individual departments to conduct their clinical activities through tax-exempt corporations established pursuant to chapter 180 of the Massachusetts General Laws. At the time BCHF was established in 1983, several other corporations already had been formed, all with the assistance of Nadeau. Twelve of the Hospital's fifteen departments ultimately established chapter 180 corporations.

[2] Fyler served on the Board until his retirement in 1989. On December 31, 1989, James E. Lock was named as Fyler's replacement.

[3] BCHF filed its complaint in Massachusetts Superior Court. Pursuant to Nadal–Ginard's motion, the case was removed to the United States District Court on November 29, 1993.

On appeal, Nadal–Ginard alleges that the district court committed a plethora of errors in deciding in favor of BCHF. BCHF cross-appeals on several issues which the district court decided in favor of Nadal–Ginard. We examine each of these alleged errors in the context of their common factual bases.

## III. BCHF SALARY CLAIMS

Nadal–Ginard's first allegation of error relates to the district court's finding that he violated his fiduciary duties to BCHF by setting his BCHF salary without making any disclosure to the Board of his receipt of an annual salary from HHMI. The BCHF Articles of Organization authorized the payment of reasonable compensation to its employees and members. The Hospital's Group Practice Policy Statement defined the procedures to be used in calculating the compensation, delegating exclusive authority to the BCHF president to determine the compensation levels of all BCHF members, including his or her own compensation. During his tenure, Nadal–Ginard acted in accordance with the provisions contained in these documents.

The district court found that Nadal–Ginard's setting his own salary constituted a self-interested transaction under Massachusetts law. As such, the validity of this action depended on whether the other Board members had approved the corporate action after receiving all information relevant to the decision. Finding that Nadal–Ginard failed to disclose his HHMI income to the other Board members, information the court found material to any discussion by the Board regarding the appropriate amount of his BCHF compensation, the court held that Nadal–Ginard violated his fiduciary duties. Accordingly, the court awarded damages equal to three years of his BCHF salary, an amount totaling $801,172.90.

Nadal–Ginard alleges that the district court committed two errors relating to his BCHF salary. First, he challenges the court's finding that he breached any fiduciary duties through his participation in the Board's salary decision. Second, he argues that the district court erred in denying a *quantum meruit* offset to any liability arising from such participation. We address these contentions separately.

### A. Breach of Fiduciary Duty

Nadal–Ginard contends that the district court ignored "well-established law and stipulated facts" in finding that he breached his fiduciary duties to BCHF with respect to his BCHF salary. Specifically, he argues that his compensation was at all times "fair and reasonable" in light of the services he rendered, precluding any such finding. We disagree.

■ The basic standard of care of corporate officers or directors is well-established under Massachusetts law. In essence, it is the "standard of complete good faith plus the exercise of reasonable intelligence." *Murphy v. Hanlon*, 322 Mass. 683, 79 N.E.2d 292, 293 (1948). Under this standard, officers or directors are not responsible for mere errors of judgment or want of prudence in the performance of their duties. *See Sagalyn v. Meekins, Packard & Wheat, Inc.*, 290 Mass. 434, 195 N.E. 769, 771 (1935). Further, if officers or directors act in good faith, albeit imprudently, they are not subject to personal liability absent clear and gross negligence in their conduct. *See Spiegel v. Beacon Participations, Inc.*, 297 Mass. 398, 8 N.E.2d 895, 904 (1937).

■ This basic standard of care is enhanced in situations when an officer or director engages in self-dealing. *See Johnson v. Witkowski*, 30 Mass.App. 697, 573 N.E.2d 513, 522 (1991). Courts subject these transactions to "vigorous scrutiny," obligating the officers or directors to prove two elements: first, that the officer or director acted in good faith with respect to the transaction; and, second, that the transaction is inherently fair from the corporation's point of view.[4]

---

**4.** We stop at this point to note the fact that the district court correctly found that corporate bylaws permitting conflicts of interest by its officers or directors do not relieve that individual of his obligation to act in good faith. *See, e.g., Spiegel v. Beacon Participations, Inc.*, 297 Mass. 398, 8 N.E.2d 895, 907 (1937) (stating that organic documents which create conflicts of interests for directors or officers provide no immunity to those individuals for acting in bad faith). We

*Crowley v. Communications for Hospitals, Inc.,* 30 Mass.App. 751, 573 N.E.2d 996, 1000 (1991); *see also Winchell v. Plywood Corp.,* 324 Mass. 171, 85 N.E.2d 313, 317 (1949). The former element requires a corporate officer to fully and honestly disclose any information relevant to the transaction, thereby permitting a disinterested decision maker to exercise informed judgment. *See, e.g., Dynan v. Fritz,* 400 Mass. 230, 508 N.E.2d 1371, 1378 (1987); *Cooke v. Lynn Sand & Stone Co.,* 37 Mass.App. 490, 640 N.E.2d 786, 791 (1994). The latter element emanates from the officer's or director's responsibility "to refrain from taking an undue advantage of the corporation," and gives rise to a fiduciary breach in a situation where an officer determines his or her salary when that individual's salary exceeds the fair value of services rendered. *Sagalyn v. Meekins, Packard & Wheat, Inc.,* 195 N.E. at 771; *see also Heise v. Earnshaw Publications,* 130 F.Supp. 38, 40 (D.Mass.1955).

▮ The district court found a lack of good faith on Nadal–Ginard's part as a result of two factual findings: first, that Nadal–Ginard failed to disclose his HHMI salary and benefits to the other BCHF directors; and, second, that this information was material to any decision concerning the amount of Nadal–Ginard's BCHF salary. We accept the former as true, as Nadal–Ginard alleges no error with respect to this finding.[5] Nadal–Ginard suggests error with respect to the latter finding, however, arguing that the district court reached this conclusion because it erroneously believed that BCHF and HHMI paid him for the same or related research activities. Specifically, Nadal–Ginard argues that the district court "grossly mischaracterized" the services Nadal–Ginard rendered to BCHF and its affiliates. In so

doing, we believe that it is Nadal–Ginard who offers a mischaracterization.

The district court found only that the HHMI salary information "was material to any decision on the appropriate compensation paid by BCHF for the same or related research activities...." Trial Court Opinion, p. 32. Nowhere in its opinion did the court conclude that Nadal–Ginard engaged in the same or related work for both BCHF and HHMI. Rather, this statement merely indicates that the court believed that the BCHF Board, armed with the information about the HHMI salary, might have found that Nadal–Ginard engaged in similar or related research. Indeed, in the succeeding paragraph, the court stated that "[i]f the defendant had disclosed his salary from [HHMI], BCHF *may have determined*" that it could have used part of Nadal–Ginard's salary for other purposes. Trial Court Opinion, p. 32 (emphasis added). Because we believe that the district court did not make the finding Nadal–Ginard suggests is erroneous, we find no error on the part of the district court.

▮ Notwithstanding the district court's finding of an absence of good faith, Nadal–Ginard argues that he could not have breached his fiduciary duties to BCHF because his salary was at all times fair and reasonable. In so doing, however, Nadal–Ginard neglects to address the first predicate of the legal analysis. When, as in this case, a court finds that an officer failed to act in good faith, it follows that a fiduciary breach exists, and the need to determine whether or not an officer's salary is objectively reasonable is obviated.

### B. *Quantum Meruit Offset*

Nadal–Ginard next suggests that, even if the district court correctly found that he breached his fiduciary duties, it erroneously

---

need not elaborate on this finding, as it is not challenged on appeal.

**5.** At one point, Nadal–Ginard did suggest that his relationship with HHMI amounted to an outside business activity, one that did not constitute an usurpation of a BCHF corporate opportunity. He argues that the absence of any such usurpation eliminates the need for the disclosure of the relationship. We disagree. The issue at bar does not concern the propriety of Nadal–Gi-

nard's relationship with HHMI. Indeed, there has been no suggestion that Nadal–Ginard entered this relationship in violation of his agreement with BCHF. As a result, his disclosure obligation did not arise from the fact of his relationship with HHMI, but rather because of his involvement in a self-interested transaction. We note, however, that the terms of his agreement with HHMI precluded Nadal–Ginard from accepting his BCHF salary.

calculated his liability for this breach to be the total compensation he received from BCHF after November 12, 1990.[6] Nadal–Ginard contends that principles of equity, specifically the theory of *quantum meruit*, required the district court to exclude from BCHF's damages that portion of Nadal–Ginard's salary which represented the reasonable value of the services he rendered to BCHF. Nadal–Ginard alleges two ways in which the district court erred with respect this issue.

First, Nadal–Ginard argues that the district court erroneously decided that it was precluded from applying such an offset in cases in which a defendant has committed an unexcused fiduciary breach. We dispense with this allegation forthwith, as even a cursory review of the district court's opinion fails to reveal such a pronouncement. Indeed, the district court expressly assumed that it was permitted to weigh such considerations: "I assume, without deciding, that a court has authority when determining the appropriate measure of damages for breach of fiduciary duty, in a context such as this, to weigh the harm caused by the defendant's breach with the benefits to the plaintiff from the defendant's overall performance of his duties." Trial Court Opinion, pp. 46–47.

Nadal–Ginard next asserts that the district court erred in factoring the harm to BCHF's reputation that resulted from his fiduciary breach into its damages equation. Although Nadal–Ginard couches this claim in terms of a denial of what he refers to as a *quantum meruit* offset, in reality, he is challenging the method by which the district court applied the *quantum meruit* analysis. In whatever light this allegation is viewed, however, it must fail.

Under Massachusetts law, trial courts are vested with the discretion to determine the amount of damages for fiduciary breaches according to the peculiar factors of each individual case. *See Chelsea Industries, Inc. v. Gaffney*, 389 Mass. 1, 449 N.E.2d 320, 327 (1983); *Lydia E. Pinkham Medicine Co. v.*

*Gove*, 303 Mass. 1, 20 N.E.2d 482, 486 (1939). Notwithstanding the existence of this discretion, courts have consistently followed the same routine in determining whether such an offset is warranted. We examine Nadal–Ginard's allegation of error after synthesizing this routine.

■ Most courts begin their analyses with the baseline proposition that a court can require a corporate officer, director, or trust agent or employee to forfeit the right to retain or receive his or her compensation for conduct in violation of his or her fiduciary duties. *See, e.g., Chelsea Industries, Inc. v. Gaffney*, 449 N.E.2d at 326–27; *Lydia E. Pinkham Medicine Co. v. Gove*, 20 N.E.2d at 486. Such a forfeiture can be required even absent a showing of actual injury to the employer. *See Chelsea Industries, Inc. v. Gaffney*, 449 N.E.2d at 327. Indeed, "[a] trustee who commits a breach of trust or an agent who is guilty of disloyal *conduct* ... imperils his right to compensation." *Lydia E. Pinkham Medicine Co. v. Gove*, 20 N.E.2d at 486 (emphasis added).

■ The courts next proceed to determine whether they should stray from the baseline and require a disloyal employee to repay only that portion of his or her compensation, if any, in excess of the value of his or her service to the employer. *See, e.g., Chelsea Industries, Inc. v. Gaffney*, 449 N.E.2d at 327; *Anderson Corp. v. Blanch*, 340 Mass. 43, 162 N.E.2d 825, 830 (1959); *Lydia E. Pinkham Medicine Co. v. Gove*, 20 N.E.2d at 486. Courts weigh two factors when contemplating whether such a deviation is warranted: first, whether the defendant has met his or her burden of establishing the value of the services rendered, *see Chelsea Industries, Inc. v. Gaffney*, 449 N.E.2d at 327; and, second, the nature of the defendant's conduct, *see, e.g., Production Mach. Co. v. Howe*, 99 N.E.2d at 36. It is only when a court is satisfied that a defendant has established the value of his services, and that his or her conduct was not egregious, that such

---

6. BCHF argues in its cross-appeal that the district court incorrectly applied a three-year statute of limitations on its cause of action, and therefore, its damages should include amounts equal

to the compensation Nadal–Ginard received prior to November 12, 1990, as well. We address this claim below. *See infra* part VII.A.

an offset is factored into the damage equation.

Nadal–Ginard asserts that the district court erred in examining the harm to the reputation, services, and functions of BCHF that would naturally flow from the public disclosure of Nadal–Ginard's conduct because the plaintiff failed to prove such harm. In so asserting, Nadal–Ginard has the right church, but wrong pew.

Nadel–Ginard is correct in his assertion that a plaintiff normally can recover only those damages which he or she has proven to have incurred. *See Hendricks & Assocs., Inc. v. Daewoo Corp.*, 923 F.2d 209, 217 (1st Cir.1991); *Snelling & Snelling of Mass., Inc. v. Wall*, 345 Mass. 634, 189 N.E.2d 231, 232 (1963). In this instance, however, the district court was not factoring the reputational harm into its damage calculations. Rather, the court considered this harm only in its analysis of whether an equitable offset to the damages to which BCHF was entitled was warranted. The court committed no error in doing so.[7]

In charging that BCHF failed to meet its burden in proving damages, Nadal–Ginard overlooks the fact that the main reason the district court denied the offset was because he failed to meet his. That is, the district court found the evidence he presented with respect to the value of his services to be "conflicting and speculative at best." Trial Court Opinion, p. 33. Close examination of the record evidences nothing to suggest that the district court erred in reaching such a conclusion. Nowhere in the record is there any evidence of the specific value of Nadal–Ginard's services. Indeed, Nadal–Ginard relies only on broad, self-aggrandizing statements in support of his argument.

Having addressed all of Nadal–Ginard's allegations of error relating to his BCHF salary, we turn our sights to the next area in which he alleges error, that is, with respect to his claim of entitlement to indemnification from BCHF.

## IV. INDEMNIFICATION CLAIM

Nadal–Ginard contends that the district court, "in a rush to judgment," failed to thoroughly address his claims for indemnification by BCHF. Specifically, he argues that the court neglected to review the facts underlying two BCHF decisions, both instances in which the court found Nadal–Ginard's participation to amount to fiduciary breaches. Accordingly, he requests that this court reverse the district court's denial of his indemnification claims with respect to each decision. For several reasons, we decline the invitation.

A thorough examination of the district court's opinion does not bear out Nadal–Ginard's main contention. Indeed, while the district court did not include a recitation of the facts underlying these decisions in its indemnification discussion, it had no reason to do so, as it had examined both circumstances in great detail in previous sections of the opinion. The fact that it incorporated these findings by reference into the indemnification discussion does not constitute error. As such, we turn to examine the validity of the district court's conclusions.

We begin our analysis by examining the two grounds on which Nadal–Ginard asserts his entitlement. Nadal–Ginard first claims a right to indemnification from BCHF based on Article VIII of the BCHF Bylaws.[8] This provision provides that BCHF will indemnify

---

7. Even if the court's actions could be construed as invoking the general damages rule, the exception to the rule is at work here. That is, a plaintiff whose cause of action is based on an officer's fiduciary breach is not required to show that it suffered any injury in order to recover the officer's compensation. *See Chelsea Industries, Inc. v. Gaffney*, 449 N.E.2d at 328.

8. Article VIII of the BCHF Bylaws provides, in pertinent part:

Any person threatened with or made a party to any action, suit or other proceeding by reason

of the fact that he ... is or was a Director, officer, employee or other agent of the Corporation ... shall be indemnified by the Corporation against all liabilities and expenses, ... *except that no indemnification shall be provided for any person with respect to any matter as to which he shall have been adjudicated in any proceeding not to have acted in good faith in the reasonable belief that his action was in the best interests of the Corporation....*

Plaintiff's Exhibit # 4, p. 17 (emphasis added).

any liabilities and expenses incurred by an officer or director because of the position he or she holds. There is a prerequisite that must be satisfied in order to be entitled to indemnification, however: the BCHF director, officer, or employee must have acted in good faith in the reasonable belief that his or her action was in the best interests of BCHF.

Nadal–Ginard turns to Chapter 180, Section 6C, of the Massachusetts General Laws for further support of his indemnification claim. This statute provides that a officer or director of a corporation shall not be held liable for the performance of his or her duties if performed "in good faith and in a manner he reasonably believes to be in the best interests of the corporation, and with such care as an ordinarily prudent person in a like position ... would use under similar circumstances." Mass.Gen.L. ch. 180, § 6C. The statute provides that an officer or director acts in good faith when acting on, *inter alia,* the advice or opinions of counsel, providing the officer or director did not have knowledge regarding his or her actions that would cause such reliance to be unwarranted. *See id.*

It is the latter portion of the Massachusetts statute on which Nadal–Ginard relies in asserting his claim. He argues that BCHF should indemnify him for damages arising out of two transactions, as, in both cases, he acted on the advice of an attorney. We examine the merits of these claims after first reviewing the underpinnings of the transactions in question.

The first fiduciary breach arose out of his involvement in determining his BCHF salary. We need not tarry in reviewing the circumstances underlying this transaction, as we have already devoted a good portion of the opinion to doing so. *See supra* part III. We need only make note of the new wrinkle that Nadal–Ginard adds in his effort to obtain indemnification: his contention that he acted as he did because Nadeau represented to him that to do so was legal.

The second fiduciary breach for which Nadal–Ginard claims a right to indemnification arose out of his actions in directing BCHF funds to be deposited into a Guardian Life Insurance Escrow Account, established for the purpose of paying premiums to the Guardian Life Insurance Company on a $6,000,000 life insurance policy in Nadal–Ginard's name.[9] The court found that Nadal–Ginard did not, at any time, disclose the existence of the Escrow Account to the other BCHF Board members, nor did he obtain authorization to make payments to such an account. Because this transaction was clearly self-interested, the court held that the payment of BCHF funds to the Escrow Account amounted to a breach by Nadal–Ginard of his fiduciary duty of loyalty, and therefore included the sum total of the payments in its judgment for BCHF.

The basis for Nadal–Ginard's indemnification argument for the Escrow Account damages mirrors that with respect to his compensation. He argues that the Guardian Escrow Account was "the brainchild" of Gary Banks, an attorney to whom Nadal–Ginard turned for advice in 1987. Nadal–Ginard claims that because Banks created the Guardian Life Insurance Escrow Account, he should have been able to assume that it was structured in conformity with the law. As a result, he argues that he is entitled to indemnification for the portion of the damages equaling the BCHF payments to the Escrow Account.

At trial, Nadal–Ginard did not prevail on either argument. First, the district court discredited Nadal–Ginard's contention that he relied upon the advice of the attorneys. Second, the district court found that neither attorney ever affirmatively advised Nadal–Ginard as to the legality of his actions in either transaction. On appeal, Nadal–Ginard does not challenge the district court's interpretation of either the BCHF Bylaw or the Massachusetts statute. Instead, he contends that there was insufficient evidence on which to support the court's conclusions.

**9.** In its opinion, the district court noted that the evidence showed that, in addition to being used to make premium payments for the life insurance policy, the funds in the Escrow Account were used to pay Nadal–Ginard's federal and state income taxes, as well Nadal–Ginard's personal mortgage loan application fee.

In reviewing this claim, we are mindful that we review findings of fact for clear error. *See Texaco Puerto Rico, Inc. v. Department of Consumer Affairs,* 60 F.3d 867, 875 (1st Cir.1995). When those findings of fact are based on the credibility of witnesses, great deference is given to the district court's findings. *See Maness v. Star–Kist Foods, Inc.,* 7 F.3d 704, 708 (8th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2678, 129 L.Ed.2d 813 (1994); *cf. Inwood Lab., Inc. v. Ives Lab., Inc.,* 456 U.S. 844, 855, 102 S.Ct. 2182, 2189, 72 L.Ed.2d 606 (1982). Indeed, "[i]n the absence of egregious lapses in such a perception, appellate courts leave it undisturbed." *Charves v. Western Union Telegraph Co.,* 711 F.2d 462, 464–65 (1st Cir. 1983).

Here, we find no error. Nadal–Ginard points to nothing in the record, nor do we find anything on our own, to suggest that the district court's discrediting of Nadal–Ginard's testimony is egregious. Indeed, the district court pointed out that Nadal–Ginard failed to comply with the requirements in the documents as he understood them, never mind comply with interpretations offered by counsel. Further, there is ample evidence in the record unrelated to these transactions which lends support to the district court's findings.

Even assuming that Nadal–Ginard's credibility was not at issue, Nadal–Ginard fails to clear the next hurdle. That is, Nadal–Ginard fails to direct this court to any place in the record evidencing the fact that either attorney advised Nadal–Ginard that he was legally entitled to *act* as he did. An attorney's representation as to the legality of a particular corporate structure does not mean that an officer or director can act in any manner he or she chooses within the confines of that structure. Indeed, an officer is bound further by the confines of the law. So it is here: the fact that both Nadeau and Banks advised Nadal–Ginard that the corporate structures in question were legally valid does not absolve Nadal–Ginard from liability incurred by his improper actions. Accordingly, we find no error on the part of the district court, and now proceed to address Nadal–Ginard's two remaining allegations of error.

## V. THE BANKS PLAN

In 1985 or early 1986, the Board of Directors adopted a severance benefit plan, referred to as the "Nadeau Plan," by written consent.[10] In early 1987, Nadal–Ginard presented the Board with what he claims was a reconstruction of the Nadeau Plan, a document that he contends was lost. In so doing, Nadal–Ginard did not inform the Board that the Banks Plan provided far more in benefits for Nadal–Ginard than the Nadeau Plan had. In 1992, upon Nadal–Ginard's initiative, the Banks Plan was terminated and Nadal–Ginard received benefits in the form of cash and securities valued at over $4,000,000.

The district court made several findings with respect to the creation and adoption of the Banks Plan. First, it found the terms of the plan to be so markedly different from the Nadeau Plan that Nadal–Ginard's actions could not be construed as a genuine effort to reconstruct the Nadeau Plan. Second, the district court found that Nadal–Ginard's benefits under the Banks Plan were of such a magnitude, and structured in such a way, that had they been disclosed at the time the plan was presented to the Board, the plan would not have been approved by the Board. The district court concluded that Nadal–Ginard breached his fiduciary duties to BCHF with respect to his involvement in the creation of the plan and its presentation to the Board. Accordingly, the court awarded damages to BCHF in the amount of $4,082,-273.50.

While Nadal–Ginard disputes the district court's factual findings, he does not challenge them on appeal. Rather, Nadal–Ginard contends that ERISA explicitly exempts these types of severance benefit plans from its fiduciary duty provisions. Further, he alleges that 29 U.S.C. § 1144, which provides for the preemption of state law by ERISA, precludes the evaluation of Nadal–Ginard's actions in light of fiduciary responsibilities defined by state law.

---

10. The district court found no evidence as to the exact date the directors adopted this plan. However, it did find sufficient evidence to conclude that it was legally adopted. This finding is not challenged on appeal.

The district court did not address the issue of the whether the fiduciary provisions of ERISA applied to the Banks Plan or whether it fell within the category of unfunded plans which are excluded from the scope of those fiduciary standards. The court did find that the fiduciary obligations created under Massachusetts law were more favorable to Nadal–Ginard than those imposed by ERISA, and, therefore, that a fiduciary breach under Massachusetts law would necessarily constitute a breach of the ERISA fiduciary obligations, if applicable. As neither party challenges the conclusion that the Banks plan is exempt from ERISA's fiduciary provisions, we concentrate solely on whether ERISA preempts the application of state law in this instance.

" 'ERISA is a comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans.' " *Ingersoll–Rand Co. v. McClendon,* 498 U.S. 133, 137, 111 S.Ct. 478, 481, 112 L.Ed.2d 474 (1990) (quoting *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 90, 103 S.Ct. 2890, 2896, 77 L.Ed.2d 490 (1983)). In vast detail, ERISA imposes participation, funding, and vesting requirements on such plans, as well as establishes uniform standards for pension and welfare plans, including rules concerning reporting, disclosure, and fiduciary responsibility. *See id.* An inherent part of this system is section 514(a), which provides that ERISA supersedes "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan...." 29 U.S.C. § 1144(a); *see also Ingersoll–Rand Co. v. McClendon,* 498 U.S. at 137, 111 S.Ct. at 481. The statute defines the term "State law" to include "all laws, decisions, rules, regulations, or other State action having the effect of law, of any State." 29 U.S.C. § 1144(c)(1); *see also Carlo v. Reed Rolled Thread Die Co.,* 49 F.3d 790, 793 (1st Cir.1995). Congress included § 514(a) to ensure uniformity in such plans by preventing states from imposing divergent obligations upon them. *See Simas v. Quaker Fabric Corp. of Fall River,* 6 F.3d 849, 852 (1st Cir.1993).

The Supreme Court has repeatedly interpreted the preemption provision to cover any state law that "has a connection with or reference to" an ERISA plan. *District of Columbia v. Greater Washington Board of Trade,* 506 U.S. 125, 129, 113 S.Ct. 580, 583, 121 L.Ed.2d 513 (1992); *see also Mackey v. Lanier Collection Agency & Service, Inc.,* 486 U.S. 825, 829, 108 S.Ct. 2182, 2185, 100 L.Ed.2d 836 (1988); *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 96–97, 103 S.Ct. 2890, 2899–2900, 77 L.Ed.2d 490 (1983). Indeed, this provision is to be read expansively, *see Rosario–Cordero v. Crowley Towing & Transp. Co.,* 46 F.3d 120, 122 (1st Cir.1995), and has the effect of preempting any state law that refers to, or has a connection with, covered benefit plans, "even if the law is not specifically designed to affect such plans, or the effect is only indirect." *District of Columbia v. Greater Washington Board of Trade,* 506 U.S. at 130, 113 S.Ct. at 583 (citations and internal quotation marks omitted). Such a preemption is also worked "regardless of whether there is a 'comfortable fit between a state statute and ERISA's overall aims.' " *Simas v. Quaker Fabric Corp. of Fall River,* 6 F.3d at 852 (quoting *McCoy v. MIT,* 950 F.2d 13, 18 (1st Cir. 1991), *cert. denied,* 504 U.S. 910, 112 S.Ct. 1939, 118 L.Ed.2d 545 (1992)).

State laws that have merely a "tenuous, remote, or peripheral connection with a covered benefit plan" may not be preempted by ERISA. *Rosario–Cordero v. Crowley Towing & Transp. Co.,* 46 F.3d at 123 (citation and internal quotation marks omitted). Such is normally the case with respect to laws of general applicability. *See District of Columbia v. Greater Washington Board of Trade,* 506 U.S. at 130 n. 1, 113 S.Ct. at 583 n. 1; *Rosario–Cordero v. Crowley Towing & Transp. Co.,* 46 F.3d at 123; *Combined Mgt., Inc. v. Superintendent of the Bureau of Insurance,* 22 F.3d 1, 3 (1st Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 350, 130 L.Ed.2d 306 (1994). A court cannot conclude that a state law is one of general applicability, and as such is not preempted by ERISA, based on the form or label of the law, however. *See Carlo v. Reed Rolled Thread Die Co.,* 49 F.3d at 794 n. 3; *Zuniga v. Blue Cross and Blue Shield of Michigan,* 52 F.3d 1395, 1401 (6th Cir.1995). Absent precedent on a closely related problem, the inquiry into

whether a state law "relates to" an ERISA plan or is merely "tenuous, remote, or peripheral" requires a court to look at the facts of particular case. *See Rosario–Cordero v. Crowley Towing & Transp. Co.*, 46 F.3d at 125 n. 2.

■ Here, the alleged breach of fiduciary duty relates to Nadal–Ginard's action in establishing the Banks Plan without disclosing information that a self-interested fiduciary would be required to reveal to his fellow directors. Nadal–Ginard's misconduct preceded the formal adoption of the plan. The legal determination that Nadal–Ginard's conduct constitutes a fiduciary breach does not require the resolution of any dispute about the interpretation or administration of the plan. Further, the application of state law in this instance does not raise the core concern underlying ERISA preemption. Indeed, the fact that Nadal–Ginard chose an ERISA plan rather than some other form of compensation is peripheral to the underlying claim that Nadal–Ginard breached his corporate responsibilities.

This being the case, it cannot be said that Massachusetts fiduciary law must be preempted in this instance. Therefore, we turn to address the merits of the district court's conclusion that Nadal–Ginard's actions violated his fiduciary duties.

■ As Nadal–Ginard does not allege error with respect to the law which the district court applied in reaching its conclusion, we need not revisit the duties of good faith and full disclosure arising in self-interested transactions. *See supra* part III.A. Instead, we turn without delay to review the validity of the district court's factual findings which served as the basis for its legal conclusion, keeping in mind, once again, that we do so in light of the clearly erroneous standard. *See Texaco Puerto Rico, Inc. v. Department of Consumer Affairs*, 60 F.3d at 874.

The district court made several findings of fact on which it grounded its conclusion that Nadal–Ginard breached his fiduciary duties. Chief among these was that Nadal–Ginard intentionally had the Banks plan drafted in two parts in order that the other Board members might enact the plan without learning of the magnitude of his blatantly disproportionate share of the benefits. The court determined that this effort met with success, as it found that the other Board members did not learn all the terms of the Banks plan until the fall of 1993. The court reached these factual conclusions on the basis of the testimony of the witnesses and an examination of the plan itself. Further, the court expressly discredited Nadal–Ginard's assertions.

In reviewing the vast record from the district court, we find that Nadal–Ginard fails to meet the heavy burden which the law places on him. That is, Nadal–Ginard offers no evidence to suggest that the district court's findings were clearly in error. As much of the court's findings are based on credibility determinations of the witnesses who testified at trial, we decline to reverse the conclusions reached below.

## VI. DAMAGE CALCULATIONS

In the fall of 1993, additional misdeeds on the part of Nadal–Ginard were discovered. Four checks made out to third parties bore questionable endorsements, each of which had been deposited into Nadal–Ginard's personal bank accounts. Nadal–Ginard thereafter wrote checks to BCHF to replace the funds that had been traced to his accounts. On October 22, 1993, the Board met to discuss this situation. At this meeting, Nadal–Ginard allegedly informed the Board of his intention to seek a medical leave of absence from his various Hospital and Medical School positions, as well as from his duties as BCHF president. Nadal–Ginard alleges that the Board approved this request, and that he was subsequently hospitalized for treatment of acute depression.

Nadal–Ginard's final two allegations of error concern the methods employed by the district court in calculating BCHF's damages arising out of these facts. First, Nadal–Ginard alleges that the district court erred in denying his request for an offset in an amount equal to the disability payments to which he claims he was entitled under the Nadeau Plan because of his medical condition. Second, Nadal–Ginard contends that the district court impermissibly awarded

damages in an amount equivalent to the interest BCHF would have earned on the misappropriated funds absent Nadal–Ginard's actions. We address each of these allegations in turn.

### A. *Disability Benefits*

█ At trial, Nadal–Ginard argued that because the district court nullified the Banks Plan, it implicitly confirmed the existence of the Nadeau plan.[11] Nadal–Ginard further claimed that, as a result of his medical condition, he was totally disabled and therefore eligible for severance benefits under the terms of the Nadeau plan. Accordingly, Nadal–Ginard sought to reduce the amount of damages attributed to his fiduciary transgressions with respect to the Banks plan in an amount equal to the Nadeau plan severance benefits.

The district court denied Nadal–Ginard's claim on two grounds. First, it found evidence that suggested that Nadal–Ginard's BCHF employment was involuntarily terminated, thereby working a forfeiture of any benefits to which he otherwise would have been eligible. Second, the district court found that Nadal–Ginard had failed to prove that he was "totally disabled," and therefore was not eligible to receive benefits under the plan. Nadal–Ginard challenges both findings on appeal. We begin our analysis by detailing the severance benefit framework of the Nadeau plan.

Under section 4.1 of this plan, a participant is *eligible* for severance benefits upon "Total Disability." This condition is defined in section 2.13 of the plan as an "inability to perform usual and customary duties for [BCHF] as a result of a medically determinable physical or mental impairment. . . ." Section 2.13 further provides that "[t]he receipt by a Participant of payments under any long term disability income insurance policy . . . shall be deemed to be . . . prima facie evidence of

such Total Disability in the absence of a contrary finding by [a] physician."

The mere fact that an individual is eligible to receive severance benefits as a result of a disability does not necessary *entitle* him to those benefits, however. Indeed, section 4.2 of the plan provides for the forfeiture of all benefits by participants in certain circumstances, including BCHF's termination of a participant's employment.

The district court found that Nadal–Ginard was involuntarily terminated from his position at BCHF.[12] As section 4.2 contains no language limiting the time frame during which this provision applies, we find that the district court correctly interpreted the provision as barring the receipt of any benefits by Nadal–Ginard. As such, we need not address Nadal–Ginard's claim of eligibility for the benefits as a result of his medical condition, and we turn to address his final allegation of error.

### B. *Misappropriated Checks*

As we noted above, in 1993, the Board discovered that Nadal–Ginard had misappropriated a number of BCHF checks, each drafted between 1991 and 1992, for his personal use. The court found that Nadal–Ginard's actions with respect to these checks constituted breaches of his fiduciary duties. Notwithstanding the fact that Nadal–Ginard reimbursed BCHF for the principal amounts of these checks, the district court awarded BCHF damages for these breaches in an amount equivalent to the interest BCHF would have earned on the money between the time the checks were drafted and the time Nadal–Ginard reimbursed the funds.

In alleging error with respect to this damage award, Nadal–Ginard does not contest BCHF's right to recover an amount equal to the interest which it would have earned on the misappropriated funds. Rather, Nadal–

---

**11.** As BCHF notes in its brief, the district court did not definitively establish the existence of the Nadeau plan. Rather, the court prefaced its analysis of the merits of Nadal–Ginard's claim by stating merely that "[a] plausible argument can be made that the Nadeau plan is in effect. . . ." Because neither party explicitly addresses the validity of such an assumption, as well as the fact

that we agree with the district court's ultimate finding that Nadal–Ginard is not entitled to such benefits, we do not address the issues surrounding the viability of the Nadeau plan.

**12.** Nadal–Ginard does not challenge this finding on appeal.

Ginard contends that BCHF failed to meet its burden of submitting evidence to prove the amount of its damages, as it introduced no evidence of what the prevailing market rate was during the time in question. Nadal–Ginard contends that the trial court erred by awarding damages in an amount equal to the market interest rate, which it calculated based on the auction prices of 52–week United States Treasury bills.

■■■■ Interest is compensation fixed by law for the use of money or, alternatively, as damages for its detention. *See Perkins School for the Blind v. Rate Setting Comm'n,* 383 Mass. 825, 423 N.E.2d 765, 771–72 (1981); *Begelfer v. Najarian,* 381 Mass. 177, 409 N.E.2d 167, 170 (1980). Massachusetts law differentiates between two types of interest: interest reserved by the terms of a contract and interest awarded by law. *See Perkins School for the Blind v. Rate Setting Comm'n,* 423 N.E.2d at 772. The latter is traditionally seen in the context of prejudgment or postjudgment interest, the rate of which is traditionally fixed by statute and which is calculated based on the amount of damages that a party has sustained.

■■■■ In this case, there is no question that BCHF bore its burden of proving it was injured in an amount equivalent to the interest it would have earned on the misappropriated funds. Indeed, it sought to recover damages in an amount based on the interest it would have received using the prejudgment rates provided by statute. *See* Mass. Gen.L. ch. 231, § 6H. The application of that rate would have resulted in a windfall to BCHF, however. In light of the fact that the interest is awarded to ensure that a party is fully compensated for its injuries, the fact that the district court relied on the United States Treasury bill rates to determine the applicable interest rates did not prejudice either Nadal–Ginard or BCHF.[13] Therefore, we affirm the district court's ruling with respect this aspect of the damage award.

## VII.  BCHF'S CROSS–APPEAL

Notwithstanding its agreement with most of the district court's findings and conclu-

sions, BCHF raises a number of errors it alleges the court committed. We note that BCHF raises four issues in its cross-appeal. Based on the fact that we have already addressed the appropriate interest rate to be used in calculating its damages for the misappropriated checks, *see supra* part VI.B, as well as the fact that in its brief it concedes that this court need not address the circumstances surrounding Dr. Freed's testimony if we find in its favor with respect to the Banks plan, we address its two remaining claims below.

### A.  Statute of Limitations

■■■ BCHF first challenges the manner in which the district court applied the Massachusetts statute of limitations to limit its damages arising out of Nadal–Ginard's breaches. While BCHF does not challenge the court's finding that Massachusetts law imposes a three year limitation on breach of fiduciary duty claims, *see* Mass.Gen.L. ch. 260, § 2A, BCHF alleges that the district court should have found the statute to have been tolled because Nadal–Ginard concealed his misdeeds. As such, BCHF asks this court to reverse the district court's judgment insofar as it precludes the recovery of damages arising from its salary and Escrow Account claims prior to November 12, 1990. We decline.

The general rule in Massachusetts is that a cause of action in tort, in this case a claim based on the violation of a fiduciary duty, must be commenced within three years of the time the breach occurs. *See id.* As with any rule, however, there exists at least one exception, which, in this case, is defined by statute:

> If a person liable to a personal action fraudulently conceals the cause of such action from the knowledge of the person entitled to bring it, the period prior to the discovery of his cause of action by the person so entitled shall be excluded in determining the time limited for the commencement of the action.

Mass.Gen.L. ch. 260, § 12.

In general, this statute "requires a plaintiff to show an affirmative act of fraudulent con-

---

13. BCHF, in its cross-appeal, alleges that the district court erred in not applying the prejudg-ment interest rate provided under Massachusetts law with respect to these funds.

cealment on the part of the defendant."
*Maggio v. Gerard Freezer & Ice Co.*, 824
F.2d 123, 130 (1st Cir.1987). Once again,
however, a relevant exception exists. In
cases where "a fiduciary relationship exists
between plaintiff and defendant ... [the]
mere failure to reveal information *may* be
sufficient to constitute fraudulent con-
duct...." *Id.* (emphasis added); *see also
Puritan Medical Center, Inc. v. Cashman*,
413 Mass. 167, 596 N.E.2d 1004, 1010 (1992).

The district court applied both the statuto-
ry language and the relevant case law to the
facts at hand. That is, while it recognized
that Massachusetts law no longer required a
plaintiff to show active concealment on the
part of the defendant in order to toll the
statute of limitations, it found that the law
did not require a tolling *per se* when the
cause of action concerned the breach of a
fiduciary duty of disclosure. Concluding that
the facts below differed from those in *Puri-
tan* in that the information in question was
either of general knowledge or easily accessi-
ble to the other Board members, it declined
to apply the statute's tolling provisions.

We find no error in the district court's
interpretation of the applicable Massachu-
setts tolling provisions. Indeed, as the court
pointed out below, the cases hold only that
the breach of a duty to disclose *may* be
sufficient to invoke the tolling provisions.
*See Puritan Medical Center, Inc. v. Cash-
man*, 596 N.E.2d at 1010; *Maggio v. Gerard
Freezer & Ice Co.*, 824 F.2d at 130. There is
no suggestion that such a breach requires
the tolling provisions to be applied in all
cases. Indeed, such a conclusion would be
counterintuitive.[14]

An examination of the record reveals noth-
ing to suggest that the district court erred in
refusing to find the statute tolled. As such,
we turn to address the final issue BCHF
raises in its cross-appeal.

### B. *BCHF Fringe Benefits*

■ BCHF's second allegation of error
arises out of the district court's findings that
Nadal–Ginard failed to disclose his HHMI

employment to the Board. Specifically,
BCHF argues that the district court erred
by not finding that Nadal–Ginard breached
his fiduciary duties by failing to disclose to
the Board the fact that he was receiving a
fringe benefits package from HHMI. Once
again, we find no error on the part of the
district court.

The district court, applying the principles
underlying fiduciary obligations that we have
already detailed, *see supra* part III.A, found
that BCHF failed to prove what the HHMI
benefits were and whether they were compa-
rable to those provided by BCHF. Thus, the
court found nothing to suggest the HHMI
benefit information would have affected the
outcome of the Board's determination of Na-
dal–Ginard's BCHF fringe benefits package.
Therefore, it concluded that there was insuf-
ficient evidence to find that Nadal–Ginard
failed to act in good faith with respect to the
fringe benefits, and thus no basis for finding
he breached his fiduciary duties in this re-
gard.

Having found nothing in the record to
suggest that the district court's factual find-
ing with respect to the sufficiency of the
fringe benefit evidence was clearly errone-
ous, we find no need to disrupt the district
court's finding.

### VIII. CONCLUSION

For the foregoing reasons, the judgment of
the district court is *affirmed. Two-thirds
costs in favor of BCHF.*

---

14. This would be so in a case in which Board
members learned of the non-disclosed informa-
tion on their own, yet chose not to act. In that
case, they would be able to recover damages
beyond the traditional statute of limitations peri-
od notwithstanding their inaction.