van Gestel, J.
This matter is before the Court on a motion in limine under G.L.c. 23 IB, Sec. 4, filed by the defendants Gary Banks (“Banks”), Robert J. Gold (“Gold”) and Robert J. Gold & Company, RC. ("Gold & Company”) (all collectively called “the moving parties”). The moving parties seek a determination of the effect of certain prior settlements between the plaintiff, Boston Children’s Heart Foundation, Inc. (“BCHF”), and Bernardo Nadal-Ginard (“Nadal”) and others.[1]

*590
BACKGROUND

The following does not purport to recite the entire history of this unfortunate matter, but rather shall only serve to provide enough information to make this memorandum and the order that flows therefrom comprehensible.
Nadal, a prominent research cardiologist and onetime president of BCHF, became involved in a scheme — one might say a series of schemes — to divert substantial amounts of BCHF funds to and for his own personal use. Nadal was caught, criminally convicted, and incarcerated. Also, BCHF, in the Federal Court, won a $6.5 million dollar civil judgment against Nadal. Thereafter, following serious collection efforts and an appeal, BCHF settled with Nadal and the others for a portion of the $6.5 million.
BCHF here has sued the moving parties, who were professional advisors to it during the time of Nadal’s improprieties, for malpractice in connection with Nadal’s diversion of in excess of $4 million of its funds through the misuse of a severance benefit plan (the “severance plan”). BCHF has not sued the moving parties for all of the $6.5 million in losses caused by Nadal.
On December 2, 1994, the U.S. District Court entered judgment in favor of BCHF and against Nadal. That judgment was for a single dollar amount, as follows:
Judgment for the plaintiff, Boston Children’s Heart Foundation, Inc., against defendant, Bernardo Nadal-Ginard, in the amount of $6,562,283.02, and costs, with post-judgment interest at the federal judgment rate of 7.22% per annum.
The trial court’s judgment was affirmed on appeal. See BCHF v. Nodal, 73 F.3d 429, 432 (1st Cir. 1996).
The elements making up the Federal court judgment against Nadal consisted of the following items:
Item Amount Date
Severance benefit plan distribution $4,082,273.50 12/31/92
Salary payments 801,172.90 11/12/90-9/2/93
Escrow payments In Nadal’s favor 736,337.09 2/27/92-6/12/92
Misappropriations by check (11,586.06) 6/14/91-6/12/92
Personal legal fees 9,746.50 Early 1993
Prejudgment Interest 744,339.09 11/12/93-12/2/94
Attorneys fees 200,000.00 11/12/93-12/2/94
Postjudgment interest 999,828.00 12/2/94-1/30/97
TOTAL $7,562,110.90
Following the entry of judgment in the Federal Court, BCHF commenced separate enforcement proceedings against Nadal, also in the Federal Court, and pursued a claim in the personal bankruptcy of Nadal’s wife. BCHF is said to have expended $550,254 in attorneys fees prosecuting these matters, all of which preceded the settlement with Nadal.
The settlement between BCHF and Nadal was made up principally of three illiquid assets: a contemporary art collection: two condominiums; and stock in a closely-held corporation known as MyoGenics, Inc.
The art collection was valued by Christie’s at $5,253,500. Sotheby’s provided an independent opinion that the Christie’s $5.25 million appraisal was “reasonable.” Nadal originally paid about $4.022 million for the art collection.
The settlement agreement was entered into on January 14, 1997. In addition to the art collection, the condominiums and the stock in MyoGenics, BCHF received $150,000 from Nadal’s wife, $200,000 from Nadal’s attorneys and a miscellaneous disability insurance payment of $21,390.
The settlement agreement contained the following stipulated values: $4 million for the art collection; $160,000 for the condominiums; and a net amount of $187,990 for the MyoGenics stock. The art collection actually produced a net amount of $4.902 million when sold. The condominiums netted $144,000 when sold. The value of the MyoGenics stock at the time of settlement is disputed, with BCHF contending for a negligible value.

DISCUSSION

The moving parties argue that a correct interpretation of the contribution statute, G.L.c. 23 IB, Sec. 4, should enable them to deduct from any amounts for which they may ultimately be held accountable the greater of any amount stipulated in the settlement release or the amount of the actual value of any asset contributed thereto. BCHF argues that a party cannot pick and choose among assets, but rather must accept either the stipulated value as to all or the actual value as to all.
The parties also disagree over how the ultimate amount, whichever way it is determined, should be allocated, and whether the attorneys fees in the presettlement collection effort by BCHF may be deducted from the proceeds received from Nadal.
G.L.c. 23IB, Sec. 4, reads in its totality as follows:
When a release or covenant not to sue or not to enforce judgment is given in good faith to one of two or more persons liable in tort for the same injury:
(a) It shall not discharge any of the other tortfeasors from liability for the injury unless its terms so provide; but it shall reduce the claim against the others to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, whichever is the greater; and
(b) It shall discharge the tortfeasor to whom it is given from all liability for contribution to any other tortfeasor.
The purpose of this statute is to promote settlements. Bishop v. Klein, 380 Mass. 285, 294-95 (1980); *591 Slocum v. Donahue, 44 Mass.App.Ct. 937, 938 (1998); Sword & Shield Restaurant, Inc. v. Amoco Oil Co., 11 Mass.App.Ct. 832, 834 (1981). “It is plain that the evil to be remedied was the unfairness of allowing a disproportionate share of the plaintiffs recovery to be borne by one of several joint tortfeasors, and the object to be accomplished was a more equitable distribution of that burden among those liable in tort for the same injury.” Hayon v. Coca Cola Bottling Co., 375 Mass. 644, 648 (1978).

Determination of values

In assessing how to measure an “equitable distribution” of the amounts “paid” in settlement, the parties making the “payment” and those responsible for the balance due are the ones who deserve the equitable treatment. Thus, Nadal, and those contributing with him, should get full credit for the amount of their contribution, and the remaining tortfeasors also ought to receive full credit for Nadal’s contribution. While it may be for Nadal to claim that the moving parties here did not pay their fair share of the total due BCHF, it is not for the latter, by minimizing the value of Nadal’s payments, to gain more from them.[2]
Thus, this Court rules that the moving parties are entitled to pick and choose among the assets provided in settlement by Nadal, thereby receiving credit for greater of the actual value or the stipulated value on an asset-by-asset basis. The result of this ruling is that the moving parties are entitled to credit for: $4,902,270, the agreed-upon value of the art collection; $160,000, the stipulated value of the condominiums; $ 187,990, the stipulated value of the MyoGenics stock; $150,000, the cash payment from Nadal’s wife; and $21,390, a payment from a Guardian Life disability policy. This all aggregates to $5,421,650.

Allocation of assets

In the settlement release between Nadal and BCHF, the parties thereto purported to allocate the payments made by Nadal in such a manner that the last amount would go toward any damages awarded in the liability proceeding on account of the severance plan. The moving parties here, of course, are not parties to that document and cannot be said to be bound by it. Further, not even Nadal was in control of that attempted allocation. “The Foundation [BCHF] will be allocating the settlement proceeds to elements of its judgment as it deems appropriate, and it expects the consent of Dr. Nadal to that allocation.” So wrote counsel for BCHF to counsel for Nadal on October 15, 1996.
Again, in the equitable process dictated by the contribution statute, the Court must assure that any allocation is fair to the non-settling parties. Thayer v. Pittsburgh-Corning Corp., 45 Mass.App.Ct. 435, 440-41 (1998). Thus, as here, on the inability of the parties to agree, “nothing in G.L.c. 231B, Sec. 4, prohibits a judge from apportioning pre-trial settlements.” Id. at 441.
Here, the severance plan damages of $4,082,273.50 approximate 54% of the total $7,562,110.90 Federal Court judgment, including interest. To this Court it seems fair and equitable to use that percentage for these apportionment issues.
The total amount of the settlement, as noted above on p. 5, is $5,421,650. Fifty-four percent of that amount is $2,927,691. Therefore, deducting $2,927,691 from the severance plan damages of $4,082,273.50 leaves $1,154,582.50. From this latter amount, there must be deducted the $200,000 received from Nadal’s attorneys, leaving a balance of $954,582.50. If liability is proved against the moving parties, then $954,582.50 is the amount of damages to which BCHF will become entitled therefrom.

Attorneys fees

BCHF also claims a right to deduct the $550,254 in attorneys fees it spent chasing Nadal’s and his wife’s assets after the Federal Court judgment, but before the settlement. Nothing in G.L.c. 231B, Sec. 4, or the theories behind its adoption warrant that.

ORDER

For the foregoing reasons, this Court rules and orders that, after proper allocation and calculation, the amount of damages that the moving parties here will be responsible for, if liability against them is found, will be $954,582.50.

Nadal’s wife, Vijak Mahdavi, and Nadal’s attorneys.

Indeed, it would hardly be equitable for Nadal and BCHF, with a wink and a nod, to agree to stipulate to lower than an actual value of a contributed asset, or claim a negligible actual value to an asset with a higher stipulated value, and thereby permit BCHF to recover the differences in a judgment against the moving parties here.