John SIMAS, Plaintiff, Appellee,

v.

QUAKER FABRIC CORPORATION OF FALL RIVER, et al., Defendants, Appellees,

Commonwealth of Massachusetts, Intervenor, Appellant.

James N. GRAY, Plaintiff, Appellee,

v.

QUAKER FABRIC CORPORATION OF FALL RIVER, et al., Defendants, Appellees,

Commonwealth of Massachusetts, Intervenor, Appellant.

James N. GRAY, Plaintiff, Appellant,

v.

QUAKER FABRIC CORPORATION OF FALL RIVER, et al., Defendants, Appellees.

John SIMAS, Plaintiff, Appellant,

v.

QUAKER FABRIC CORPORATION OF FALL RIVER, et al., Defendants, Appellees.

Nos. 93–1098, 93–1103, 93–1104 and 93–1249.

United States Court of Appeals, First Circuit.

Heard June 10, 1993.

Decided Oct. 6, 1993.

---

Thomas O. Bean, Asst. Atty. Gen., with whom Scott Harshbarger, Atty. Gen., was on brief, for intervenor, appellant.

Orlando F. de Abreu on joint briefs, for plaintiffs.

Mary T. Sullivan, Donald J. Siegel and Segal, Roitman & Coleman on brief for Economic Development and Industrial Corp. of Boston, Massachusetts ALF–CIO, Intern. Union, United Auto., Aerospace, and Agricultural Implement Workers Union of America, Tax Equity Alliance of Massachusetts, Urban League of Eastern Massachusetts Inc., Child World Employees Committee, and Jewish Labor Committee, amici curiae.

Neil Jacobs, with whom Daniel W. McCarthy and Hale and Dorr were on brief, for defendants.

Arthur G. Telegen, Amy B.G. Katz, Jonathan A. Keselenko and Foley, Hoag & Eliot

on brief, for Freeman, Spogli & Co. and Avon Investors Ltd. Partnership, amici curiae.

Before SELYA, CYR and BOUDIN, Circuit Judges.

BOUDIN, Circuit Judge.

Massachusetts has in force a "tin parachute" statute requiring substantial severance payments to employees who lose their jobs within specified periods before or after a corporate takeover. Mass.Gen.L. ch. 149, § 183. The district court held this statute to be preempted by the Employee Retirement Income Security Act ("ERISA"), which by its terms "supersede[s] any and all State laws insofar as they may now or hereafter relate to any employee benefit plan...." 29 U.S.C. § 1144(a). We affirm.

I.

Quaker Fabric Corporation of Fall River is a Massachusetts corporation, with some 1350 employees in six states including Massachusetts. The company is a wholly owned subsidiary of Quaker Fabric Corporation, a Delaware corporation. John Simas went to work for Quaker Fabric Corporation of Fall River in Massachusetts in 1971, and James Gray did so in 1978. It is the discharge of Simas and Gray following a takeover of Quaker Fabric Corporation of Fall River that gives rise to this suit.

In September 1989 Quaker Fabric Corporation, and its subsidiary Quaker Fabric Corporation of Fall River, passed into the control of Union Manifatture International N.V. It appears that Union Manifatture set up a new entity called QFC Acquisition Corporation, merged it into Quaker Fabric Corporation (the surviving corporation), and ended up holding 95 percent of the shares of the latter. Presumably the former owners of Quaker Fabric Corporation received stock, cash or both. In any case, there is no dispute that a change of control occurred, and that Union Manifatture emerged as the ultimate owner of Quaker Fabric Corporation of Fall River.[1]

The Massachusetts tin parachute statute was enacted in 1989 as part of a package of anti-takeover measures. Under the statute, employees who have worked a minimum of three years for an employer, and whose employment is terminated within 24 months after a "transfer of control" of their employer, are entitled to a "one time lump sum payment" of twice their weekly compensation for each completed year of employment. Mass. Gen.L. ch. 149, § 183.[2] A condition of payment, discussed more fully below, is that the employee meet the eligibility standards for unemployment benefits under state law. *Id.* § 183(a). If the employee is covered by a corporate severance plan with more generous benefits, the tin parachute statute does not apply. *Id.* § 183(d)(1).

Both Simas and Gray were discharged from employment by Quaker Fabric Corporation of Fall River within 24 months after the takeover. At the time of his termination, Gray was covered by the company's existing severance plan but the company's severance benefits were less generous than the statute's benefits. Simas was not covered by any severance plan. Both men ultimately qualified for unemployment benefits under state law. The company nevertheless declined to make payments to them under the tin parachute statute, claiming that it was preempted by ERISA.

In late 1991, Simas and Gray filed suit in state court against Quaker Fabric Corporation of Fall River and QCF Acquisition Corporation seeking the statutory benefits. The Quaker Fabric defendants asserted the preemption defense and removed the case to district court. The district court agreed that the tin parachute statute was preempted by ERISA and it granted summary judgment in favor of the defendants. *Simas v. Quaker Fabric Corp. of Fall River,* 809 F.Supp. 163

---

1. The mechanics of the takeover are not entirely clear from the record; thus, the district court said that QCF Acquisition Corporation purchased 95 percent of the shares of Quaker Fabric Corporation *of Fall River.* The discrepancy does not affect our analysis.

2. Somewhat similar protection is afforded to employees who are discharged in prescribed periods before the takeover. *Id.* Certain types of corporations and certain types of takeovers are excluded. *Id.* §§ 183(a), (d).

(D.Mass.1992). The court remanded to state court a separate wrongful discharge claim that had been asserted by Simas but raised no federal issues. *Id.* at 168. After judgment, the Commonwealth learned of this litigation and intervened. Simas, Gray and the Commonwealth now appeal.

## II.

■■■ ERISA, as already noted, explicitly preempts "any and all State laws" that "relate to any employee benefit plan...." 29 U.S.C. § 1144(a). As the district court observed, 809 F.Supp. at 166, the words "relate to" have been construed "expansively"; a state law may relate to an employee benefit plan even though it does not conflict with ERISA's own requirements, *District of Columbia v. Greater Washington Board of Trade,* ── U.S. ──, ──, 113 S.Ct. 580, 583, 121 L.Ed.2d 513 (1992), and represents an otherwise legitimate state effort to impose or broaden benefits for employees. *Massachusetts v. Morash,* 490 U.S. 107, 116, 109 S.Ct. 1668, 1673, 104 L.Ed.2d 98 (1989). As we recently summarized the law, ERISA preempts all state laws insofar as they relate to employee benefit plans, even laws which are "a help, not a hindrance," to such plans, and regardless of whether there is a "comfortable fit between a state statute and ERISA's overall aims." *McCoy v. MIT,* 950 F.2d 13, 18 (1st Cir.1991), *cert. denied,* ── U.S. ──, 112 S.Ct. 1939, 118 L.Ed.2d 545 (1992).

■■■ Thus, a state statute that obligates an employer to establish an employee benefit plan is itself preempted even though ERISA itself neither mandates nor forbids the creation of plans. This may at first appear to be a surprising result since ERISA is primarily concerned with disclosure, proper management, vesting requirements and other incidental aspects of plans established by employers. *See generally Shaw v. Delta Airlines, Inc.,* 463 U.S. 85, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983). Yet explanation for the broad preemption provision is clear: By preventing states from imposing divergent obligations, ERISA allows each employer to create its own uniform plan, complying with only one set of rules (those of ERISA) and capa-

ble of applying uniformly in all jurisdictions where the employer might operate. *Ingersoll–Rand Co. v. McClendon,* 498 U.S. 133, 142, 111 S.Ct. 478, 484, 112 L.Ed.2d 474 (1990).

In this case, the litigation in the district court was concerned with the question whether the one-time payments ordered by the tin parachute statute comprised or related to a "plan," in light of the narrowing interpretation of that word adopted in *Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1, 107 S.Ct. 2211, 96 L.Ed.2d 1 (1987). In this court, the Commonwealth has laid more stress on a different argument, namely, its claim that the statute does not relate to an "employee" plan because it (allegedly) imposes the payment obligation not on an employer but instead on the firm that takes over the employer. We consider these two arguments in that order.

■■■ The first argument—that no "plan" is established by the tin parachute statute— was ably answered by the district court, 809 F.Supp. at 166–68, and we lay out the analysis merely to make this opinion complete. In common parlance, a directive to pay prescribed severance benefits might readily be described as a plan. But in *Fort Halifax,* the Supreme Court, by a five-to-four vote, held that the term did not encompass a Maine statute providing for a one-time, lump-sum payment to employees, based on length of service, in the event of plant closure.

The Supreme Court rejected Maine's broad argument that there was no plan because the state imposed the obligation; indeed, the Court held explicitly that a severance benefit plan would be preempted if imposed by the state. 482 U.S. at 16–17, 107 S.Ct. at 2220. The Court said, however, that Congress' concern was with state interference with benefits "whose provision by nature requires an ongoing administrative program to meet the employer's obligation." *Id.* at 11, 107 S.Ct. at 2217. Reading the term "plan" in light of this purpose, *Fort Halifax* held that the term did not include Maine's severance payment statute, which "requires no administrative scheme whatsoever," *id.* at 12, 107 S.Ct. at 2218, and calls on the em-

ployer "[t]o do little more than write a check...." *Id.*

The present case may be close to *Fort Halifax*. The Massachusetts statute, like the Maine statute, calls for payments to all eligible employees based on a specific event, here, the takeover. That similarity, however, must be set against several differences. Each of these differences increases the administrative burden imposed by the Massachusetts statute, in contrast to Maine's statute; and each makes the label "plan" better suited to the tin parachute statute. It is a matter of degrees but under *Fort Halifax* degrees are crucial.

The Maine statute starts and ends with a single, once and for all event, the plant closing, after which all payments are due. The Massachusetts statute, by contrast, is triggered separately for each three-year employee by the individual termination of that employee within one of several alternative time periods, either before or after the takeover. More important, whether a payment is due depends in Massachusetts not merely on the employee's status as a three-year employee but on whether the employee is also eligible for unemployment compensation under Massachusetts law. This is effectively a cross-reference to other requirements, most importantly that the employee not have been discharged for cause. Mass.Gen.L. ch. 151A, § 25(e)(2) ("deliberate misconduct" or "knowing violation" of employer rule or policy).

Thus, the Maine employer on closing its plant need do little more than write a check to each three-year employee. The Massachusetts employer, by contrast, needs some ongoing administrative mechanism for determining, as to each employee discharged within two years after the takeover, whether the employee was discharged within the several time frames fixed by the tin parachute statute and whether the employee was discharged for cause or is otherwise ineligible for unemployment compensation under Massachusetts law. The "for cause" determination, in particular, is likely to provoke contro-

versy and call for judgments based on information well beyond the employee's date of hiring and termination.[3]

The Commonwealth asserts that these administrative tasks are only a small step beyond what is required under the Maine statute. It argues that detailed employment records must be maintained by the employer in any event, and that the employer need only wait for the state agency to make its own decision on employee eligibility for unemployment compensation. To the last point the Quaker Fabric defendants respond that, because of the timing of employer obligations under the tin parachute statute, the employer cannot await a state agency decision that may well occur after the employer has to make the one-time payment, even assuming that the employee even applies for unemployment compensation.

It may be that in some instances, a determination of eligibility would be straightforward and, in others, the employer would have to make its own judgment and then monitor or participate in state proceedings. But in all events for at least two years after the takeover, and probably beyond that point as to disputed terminations, the employer would have to maintain records, apply the "for cause" criteria, and make payments or dispute the obligation. We think it evident that ongoing administrative obligations are imposed, of a kind and over a time period, that go far enough beyond *Fort Halifax* to call the regime a "plan" within the meaning of ERISA.

Given the Supreme Court's reasoning in *Fort Halifax*, there is no way to be certain exactly where it would draw the line. What we do know is that our sister circuits have generally read *Fort Halifax* as emphasizing the mechanical, one-time nature of the severance payments, have applied the decision to protect schemes akin to the Maine statute, and have ceased to apply the decision where the state statute or employer promise involved ongoing obligations materially beyond

---

**3.** In this case, it happens that Simas was discharged for what his employer regarded as cause (the company says that he declined to work because the low temperature aggravated his asth-

ma condition). The state Department of Employment and Training first found him ineligible but then reversed its position on later review.

those present in *Fort Halifax*.[4] It is somewhat hard to generalize about the cases because of the variety of variables in the different severance schemes, but one of the circuit decisions—*Bogue v. Ampex Corp.*, 976 F.2d 1319 (9th Cir.1992) (Wisdom, J., sitting by designation)—is closely in point.

In *Bogue*, the Ninth Circuit considered the case of the corporation that had agreed to pay a one-time, lump-sum severance benefit to each of a number of executives if the company were taken over and afterwards a protected executive did not retain "substantially equivalent employment" in the new structure. 976 F.2d at 1321. The court agreed that the employer's obligation was, as in *Fort Halifax*, a one-time, lump-sum payment contingent on a future event. But in *Bogue*, "that event would occur more than once, at a different time for each employee," 976 F.2d at 1323, and the employer had to make a substantive, "substantially equivalent" determination in each case. Accordingly, as Judge Wisdom said, "[t]here was no way to carry out [the employer's] obligation with the unthinking, one-time nondiscretionary application [involved in] . . . *Fort Halifax.*" *Id.* The Ninth Circuit therefore found the severance regime to comprise a plan. *Id.*

These distinctions, which Judge Wisdom found persuasive in *Bogue*, apply to our case and persuade us as well. In this case, as in *Bogue*, the time period is prolonged, individualized decisions are required, and at least one of the criteria is far from mechanical. Admittedly, there is not a great distance between *Bogue* and our case, on the one hand, and on the other hand cases like *Fort Halifax* or decisions that track it. But so long as *Fort Halifax* prescribes a definition based on the extent and complexity of administrative

obligations, line drawing of this kind is necessary and close cases will approach the line from both sides.[5]

■ We turn now to the alternative argument against preemption urged for the first time on appeal by the Commonwealth. Simply put, the argument is that even if the tin parachute statute imposes obligations amounting to a "plan," it is not an "employee" plan because the obligations are imposed on the "control transferee" and not the employer. Although it is common practice not to consider arguments that were not made to the district court, we think that this case— involving the constitutionality of a state statute—justifies an exception. Indeed, the Quaker Fabric defendants urge us to consider (and reject) this new argument on the merits.

It is true that the tin parachute statute does in terms make the "control transferee" (and no one else) liable for the severance payment dictated by the statute, Mass. Gen.L. ch. 149, § 183(b), and it defines "control transferee" as the person or persons who have beneficial ownership of 50 percent or more of the voting securities of the employer after the transfer. *Id.* § 183(a). This might lead one to believe that Quaker Fabric Corporation (the employer's immediate parent) and its own owner, Union Manifatture, are actually liable for the payment (even though neither was actually sued).[6]

The Quaker Fabric defendants contend that the tin parachute statute imposes liability directly upon the front-line employer. They point out that the statute by cross reference, Mass.Gen.L. ch. 149, § 183(f), provides for enforcement of its provisions

---

4. *See, e.g., James v. Fleet/Norstar Financial Group*, 992 F.2d 463 (2d Cir.1993); *Fontenot v. NL Industries*, 953 F.2d 960 (5th Cir.1992); *Whittemore v. Schlumberger Technology Corp.*, 976 F.2d 922 (5th Cir.1992); *Bogue v. Ampex Corp.*, 976 F.2d 1319 (9th Cir.1992), *amended, cert. denied,* —— U.S. ——, 113 S.Ct. 1847, 123 L.Ed.2d 471 (1993); *Pane v. RCA Corp.*, 868 F.2d 631, 635 (3d Cir.1989).

5. *E.g., James*, 992 F.2d 463, applying *Fort Halifax* to prevent preemption of an employer's promise to pay 60 days' salary as severance to each employee who remained until the facility

was closed. The court said that while employees might have different termination dates, the time frame was a short one and the payments involved no more than "simple arithmetical calculations" upon such termination, just as in *Fort Halifax. Id.* at 466–67.

6. Simas and Gray sued their employer, Quaker Fabric Corporation of Fall River, and QFC Acquisition Corp. The former obviously did not take control of itself and, as the Commonwealth describes the transaction, the latter was merged out of existence in the course of the merger.

through other statutes, directed at "employers," which are designed to secure employees the wages due to them. Mass.Gen.L. chs. 148–50. There is also some evidence that the state's Department of Labor and Industries seeks to enforce the tin parachute statute directly against immediate employers, just as Simas and Gray did in this case by suing their employer, Quaker Fabric Corporation of Fall River.

Nevertheless, it is unnecessary to decide whether the immediate employer is liable in addition to, or instead of, the control transferee—issues on which there appear to be no Massachusetts judicial precedents. For we agree with the Quaker Fabric defendants that the "control transferee" is an employer for ERISA purposes to the extent that the control transferee is obligated to make payments to the employees of its subsidiary pursuant to the tin parachute statute. This is so, in our view, by reason of the joint force of statutory language, precedent, and practical sense.

ERISA itself provides that the term employer includes "any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan." 29 U.S.C. § 1002(5). We take this language to mean that, if the plan provides ERISA-type benefits to the employees, the paymaster is classified as an "employer" so long as it is connected to the employer and is acting in the employer's interest. In our view, any payments made by the control transferee are "in the interest of" the employer. 29 U.S.C. § 1002(5). This is patently so if the control transferee assumes a liability that would otherwise be borne by the employer; but we think it is no less so even if the employer is not contingently liable under the tin parachute statute. Where employees are laid off after a control transfer, this is normally done because the employer or those who control the employer regard the down-sizing as good business. Whether or not they are right, and whatever the cause for the reduction (e.g., new debt), the fact remains that the employer has lightened its payroll.

Accordingly, if Quaker Fabric Corporation or Union Manifatture is intended to be held liable as a control transferee under the tin parachute statute, it would then be an employer under ERISA and, simultaneously, its liability would be preempted. This view is supported by cases holding that a parent company making benefit payments to employees of a subsidiary company is their "employer" under ERISA. E.g., Reichelt v. Emhart Corp., 921 F.2d 425, 427–28 (2d Cir. 1990), cert. denied, — U.S. —, 111 S.Ct. 2854, 115 L.Ed.2d 1022 (1991). The control transferee, in our situation, is very much like the parent company in a case like Reichelt.

Looking to realities, our case is even easier than cases involving parents who administer plans for their subsidiaries. There is little doubt that, if the tin parachute statute were not preempted, the severance payments would be made based upon records kept by Quaker Fabric Corporation of Fall River, pursuant to judgments implemented by its management, and almost certainly with funds from its corporate account. If the control transferee is liable under the statute, it is almost certainly a nominal liability in the ordinary case; the effective burden is on the front-line employer, here Quaker Fabric Corporation of Fall River.

It is thus hard to credit the Commonwealth's claim that the tin parachute statute has no adverse effect on one of the admitted objects of the ERISA preemption provision: to protect employers from having to comply with different directives as to benefit plans for employees depending solely on the employees' location and the desires of different state legislators. The Commonwealth's premise is that Quaker Fabric Corporation of Fall River bears no legal obligation to make the payments. But legal obligation or not, that company will almost certainly pay the bill and administer the payments, absent preemption.

In all events, we think that the statutory definition of employer in ERISA resolves the matter, even if we ignore realities and assume that the control transferee exclusively shoulders liability under the tin parachute statute. This is not a matter of "piercing the corporate veil" because another person actively dominates the corporation. Without any such dominance, payments made by a

control transferee under the tin parachute statute are "in the interest of" the employer; the control transferee is to that extent also an employer under ERISA; and preemption occurs automatically.[7]

### III.

We have been earnestly asked by the Commonwealth, and even more earnestly by an impressive set of amici supporting its position, to give weight to the benign purposes of the tin parachute statute to lessen the impact of job losses that attend corporate takeovers. Two other amici, equity investors in Massachusetts companies, urge to the contrary that the statute is unconstitutionally vague if read to place the burden of liability on control transferees who (the two amici say) may be a large and shifting group of investors.

The asserted benefits and faults of the tin parachute statute are not for us to weigh. Congress has written a manifestly broad preemption statute, the courts with few exceptions have interpreted it broadly, and our job is to carry out that mandate. It is an odd irony that, having avoided condemnation under the Commerce Clause, *see CTS Corp. v. Dynamics Corporation of America,* 481 U.S. 69, 87–94, 107 S.Ct. 1637, 1648–52, 95 L.Ed.2d 67 (1987), a portion of anti-takeover legislation should perish under an ERISA preemption clause whose full ramifications may not have been absorbed by Congress. But the ramifications are inherent in the statute, and are not for us to curtail.

It may also seem ironic that a federal statute enacted in large part to protect workers should invalidate a state measure that has worker protection as one of its primary objectives. But ERISA, like many a reform statute, has more than one purpose and more than one beneficiary. The uniformity of regulation gained by employers under ERISA was assuredly part of the legislative balancing of interests and trade-offs. *See Ingersoll–Rand,* 498 U.S. at 142, 111 S.Ct. at 484 ("the goal was to minimize the administrative and financial burden of complying with conflicting directives among States or between States and the Federal Government"). Courts, who are the least representative branch of government, are the wrong place to restrike the balance.

In the end, the claim of statutory benefits is answered definitively by *Fort Halifax* itself. Although the Supreme Court saved the Maine statute by the narrowing interpretation of "plan," the Court there rejected Maine's broader argument that its statute avoided preemption because it was an independent directive that "reflects the state's substantial interest in protecting Maine citizens from … economic dislocation…." 482 U.S. at 6, 107 S.Ct. at 2214 (quoting the Maine Supreme Judicial Court). *Fort Halifax* holds that a state statute cannot mandate benefits if they comprise an "employee benefit plan," no matter how virtuous the statute. Because the tin parachute statute imposes such a plan, it is preempted.

*Affirmed.*

---

7. We have considered the Commonwealth's argument based on its own implicit premise that a plan is not an "employee" plan unless the paymaster is the "employer," or at least one of them. This premise is far from secure. *See, e.g., Trust-* ees *of Electrical Workers Health and Welfare Trust v. Marjo Corp.,* 988 F.2d 865 (9th Cir.1992) (preempting state law imposing liability on general contractors for benefits owed by subcontractors).