Neel, Stephen E., J.
Plaintiff Paul Dougovito sues his former employer, defendant First Trade Union Bank, for benefits to which he claims entitlement following his last day of employment on June 6, 2005. His first amended complaint seeks: recovery of so-called “SERP” benefits under the Employment Retirement Income Security Act of 1974, 29 U.S.C. §1001 et seq. (ERISA) (Count II); recovery of severance benefits under ERISA (Count III); a declaration that the Bank terminated his employment without cause, triggering his SERP and severance benefits (Count IV); “breach of contract/estoppel” (Count V); and breach of the implied covenant of good faith and fair dealing (Count VI).[1] After trial without jury, the Court concludes that plaintiff has shown, as he must, that the Bank terminated his employment without cause, and orders judgment on the various counts accordingly.
*72 FINDINGS OF FACT
On the basis of the credible evidence, and reasonable inferences therefrom, I find as follows.
Parties and Participants
Plaintiff Paul Dougovito (plaintiff) resides in Marblehead, Massachusetts.
Defendant First Trade Union Bank (Bank) is a federally chartered savings bank with a principal place of business located at 25 Diydock Avenue, Boston.
Plaintiff was trained as an accountant and a certified public accountant. From May 1994 until June 6, 2005, he was employed as the executive vice president/chief financial officer of the Bank. On two occasions during this period — in 1997 and 2001-2002 — he also assumed the responsibilities of interim chief executive officer (CEO); while serving as interim CEO, he reported to Richard Kronish (Kronish), chairman of the board of directors.
When plaintiff joined the Bank in 1994, the Bank was in considerable difficulty: its regulatory agency, the Office of Thrift Supervision (OTS) had assigned the Bank a rating of “4,” the lowest possible for a banking institution still in business.
Kronish was a member of the board of directors of the Bank during the time plaintiff was employed by the Bank, and has served as chairman of the board since 1997.
William Buker (Buker) was the president and chief executive officer of the Bank from March 2003 until November 22, 2006, when his employment terminated.
Doreen Heath (Heath) is a senior vice president of the Bank, and director of Human Resources.
As chief financial officer (CFO), plaintiff reported to the chief executive officer/president.
The 1995 SERP
In 1995, the Bank established a new Supplemental Executive Retirement Plan (the 1995 SERP), designed to provide certain deferred compensation, retirement, and death benefits to each of five key Bank executive employees, including plaintiff.
The 1995 SERP was established as an incentive for its five beneficiaries to remain at the Bank for a period of time.
The 1995 SERP comprised two components: a Supplemental Executive Retirement Benefit Agreement that defined a retirement benefit amount payable to the executive, and an Executive Shared Control Insurance Agreement and Supplemental Agreements that governed the manner in which the SERP benefit would be funded.
Under the 1995 SERP, the Bank agreed to fund the SERP benefit by paying annual premiums on a “split dollar” life insurance policy on the life of each SERP beneficiary for each year that the beneficiary remained employed by the Bank. The owner of the policy was the executive, but the Bank maintained a beneficial interest until the time that the executive’s rights under the SERP were triggered.
When the Bank adopted the SERP in 1995, it anticipated that, by the time éach of the SERP beneficiaries had reached age 65, the increase in the cash surrender value of the life insurance policy would have grown, such that there would be funds in the policy sufficient to (a) provide a non-taxable retirement benefit to the beneficiary equal to at least 30% of the average of the beneficiary’s three highest years of total compensation, “tax effected,” for 15 years, and (b) to allow a repayment to the Bank in the amount of the premiums it had paid.
If the Bank’s calculation turned out to be incorrect and there was insufficient cash surrender value in the life insurance policy to provide the retirement benefit, the Bank was responsible for making up the difference.
Under the 1995 SERP, the Bank purchased a life insurance policy for each of the beneficiaries of the SERP, paid annual premiums each year that the beneficiary worked at the Bank, and each year treated a portion of the payments as a business expense for tax purposes.
For each beneficiary, the premium amount was different, depending upon the individual’s age, physical condition, and compensation. In plaintiffs case, the annual premium was $71,362.
At all relevant times, Heath and plaintiff were designated as the Plan Administrators of the SERP benefit. As Plan Administrator, Heath received information from Benmark, a benefit consulting firm, about the status of the insurance policies each year. She obtained information from Benmark concerning the portion of the insurance policy taxable to the employee each year, and processed that. She was also responsible for paying the annual premiums.
Heath paid the premiums annually by wire transfer at Benmark’s request.
In 1997, the Bank provided written notice to the Secretary of Labor that it maintained a SERP for five participants, and that the Plan Administrators were Heath and plaintiff.
Plaintiffs Performance and Relationships at the Bank Prior to 1999
Prior to 1999, the working relationship between plaintiff and Kronish was strong. As noted above, plaintiff had in 1997 become interim CEO of the Bank at a time of upheaval which involved turnover in the membership of the board, and the installation of Kronish as chairman. Kronish was grateful to plaintiff for taking on the additional duties of CEO. Kronish generally thought well of plaintiff, and considered him to be a valuable member of the Bank’s management team.
In 1997, Kronish was concerned that plaintiff might leave the Bank. In the course of their discussions about plaintiffs future employment at the Bank, Kronish asked plaintiff to provide the Bank with six months’ notice of *73 his intention to leave before he ended his employment, and promised in turn that the Bank would provide plaintiff with six months’ notice if and when the Bank decided to terminate plaintiffs services. Plaintiff agreed.
In a meeting of the Personnel Committee of the board of directors on December 18, 1997, Kronish told the Personnel Committee that plaintiff had been valuable to him in stabilizing the Bank. He also told the Committee that the most important item to plaintiff was his retirement benefit, including the 1995 SERP; that plaintiff wanted a contract providing for one year’s severance in the event of termination; and that Kronish had agreed to notify plaintiff at the time the new president or board decided in the future to replace plaintiff before a search would begin for a new CFO.
The minutes of the December 18, 1997 Personnel Committee meeting reflect “an understanding with Mr. Dougovito that the Chairman of the Bank, currently Mr. Kronish, will notify Mr. Dougovito if the Bank decides before beginning a candidate search that Mr. Dougovito [sic] services are no longer needed at the Bank. The Bank requests that Mr. Dougovito, before beginning a job search, notify the Bank of his intentions to leave the Bank.”
In 1998, the Bank hired William Placke as president and CEO. He was the second president/CEO that the Bank had hired in the previous three years.
In 1998, both Placke and the board acknowledged plaintiffs valuable services as interim CEO, particularly during the period of crisis for the Bank.
The 1999 Amendments to the 1995 SERP
In 1999, Placke and the board decided to amend the 1995 SERP and the 1995 ESCIA (the SERP as amended in 1999 is referred to hereafter as “SERP”; the ESCIA as amended in 1999 is referred to hereafter as “ESCIA”). At that time, the only remaining beneficiaries were plaintiff and Heath.
The 1999 amendments made a significant change in the Bank’s obligation to plaintiff. Under the 1995 SERP, if there was insufficient cash surrender value in the life insurance policy to provide the retirement benefit, the Bank was responsible for making up the difference; the 1999 amendments eliminated any such liability of the Bank. Instead, the Bank’s obligation to plaintiff under the SERP is capped at the amount of premiums the Bank has paid during plaintiffs employment.
Under para. VI of the ESCIA, plaintiff has 90 days following termination within which to decide whether to purchase the Bank’s interest in the policy; if plaintiff does not exercise that option, he is “deemed to have elected to assign the policy to the Bank . . .” That deadline was extended by the Court’s August 2, 2005 Order on Plaintiffs Motion for Preliminary Injunction, wherein the Court ordered that plaintiff must make his election within a 90-day period commencing when “this Court makes a final decision as to whether the plaintiff was terminated without cause or voluntarily resigned.”
Plaintiffs rights under the SERP, in light of the Court’s findings herein, are discussed below.
Plaintiffs Performance and Relationships at the Bank from 1999-2004
In 2000, the Bank decided once more that it wanted a new CEO, and gave Placke his notice. Placke left the Bank in June 2001.
In May 2001, the board once again asked plaintiff to serve as Interim CEO. Plaintiff agreed. Plaintiff was less successful in that role than in 1997, and in February 2002, the board determined that his duties as Interim CEO and CFO were “onerous and excessive.” Kronish offered to serve as Interim CEO, and began doing so in July 2002. Thereafter, plaintiff assisted Kronish in managing the Bank, as the board searched for a permanent president and CEO. Plaintiff interviewed, unsuccessfully, for that position.
One reason plaintiff was denied the post was his conduct in dealing with another executive vice president in 2002, for which both were placed on probation. Nevertheless, while Kronish acknowledged and regretted plaintiffs inability successfully to fulfill the Interim CEO role a second time, he was grateful to plaintiff for making the effort, and continued to value plaintiff as a member of the Bank’s management team.
In March 2003, the Bank hired a candidate from outside the Bank, William Buker, as President and CEO. From and after June 2003, plaintiff reported directly to Buker. Buker and plaintiff had a difficult working relationship which did not improve over time, as reflected (and exacerbated) by a series of incidents.
For example, every spring the Bank held a charity golf tournament for a cancer research foundation created by Kronish. From the inception of the foundation, plaintiff had served as a trustee at Kronish’s request; he was the only Bank employee asked to do so. In 2003, Buker did not include plaintiff as a participant in the Bank’s charity golf tournament for the foundation even though plaintiff was one of the foundation’s trustees. As a result of this and other slights, plaintiff resented Buker. His resentment, while an irritating and frustrating aspect of his job, did not prevent plaintiff from performing his duties conscientiously.
Nevertheless, in 2003 and 2004 plaintiff found that the scope of his duties was being diminished, apparently by Buker. One significant instance involved the 2003 negotiation for the sale of an interest in the Bank to the Empire State Carpenters Pension Fund. Buker did not include plaintiff in the development of that project, even though plaintiff had worked with Kronish on the project in the past. Instead, Buker assigned Dino Papagiannis, who reported to plaintiff, to work with him and Kronish on the Empire State negotiations.
In Januaiy 2004, plaintiff received his first written performance review from Buker. Although he rated *74 plaintiffs performance as “exceeds expectations,” Buker did not recommend plaintiff for a salaiy increase for 2004. Plaintiff was the only senior manager reporting to Buker whom Buker did not recommend for a raise.
Several matters arose in January 2004 on which plaintiff and Buker did not see eye to eye, including plaintiffs last-minute adjustment of the Bank’s year-end financial statement, and plaintiffs scheduling of a vacation during an OTS on-site examination of the Bank. These incidents caused Buker to believe that plaintiff was not keeping him sufficiently informed of important developments.
In Februaiy 2004, Kronish and plaintiff met for lunch to discuss plaintiffs difficulties with Buker. Kronish inquired whether plaintiff had any interest in retiring. Following that meeting, plaintiff met with Buker and expressed his interest in improving their relationship; Buker reciprocated. Kronish then invited plaintiff to a second luncheon discussion, during which Kronish asked plaintiff whether he had made his mind up about retirement. Plaintiff told Kronish that he did not want to retire, and that he planned to keep working at the Bank.
The relationship between plaintiff and Buker did not improve, but instead deteriorated over the course of 2004. During this time plaintiff was regarded as honest, and technically competent, and recognized as someone who had served for many years at the Bank, but who from time to time had had difficulties dealing with staff and others. Unfortunately for plaintiff, one of those with whom he had the most difficulty was Buker.
By August 2004, Buker had spoken with Kronish about replacing plaintiff as CFO, and had communicated with Harry McCormick of the Hayden Group, an executive search firm, to begin the process of finding a replacement. By the end of that month, Buker had determined that plaintiffs termination was not a matter of “if’ but “when.” Ex. 31.
On November 17, 2004, Buker emailed McCormick that “Rick [Kronish] and I have agreed and scheduled to communicate with the person that we had previously discussed during the second week of December ... with a target end date around March 31, 2005.” Ex. 33.
At the same time, Buker continued to redirect important assignments from plaintiff to others, marginalizing plaintiff as a member of the Bank’s management team.
Kronish was in an awkward position during 2004, attempting both to protect the plaintiff, who had long been a loyal and valuable executive and a friend, and to support the new president, whom the Bank had hired after a lengthy search. Nevertheless, when in the latter half of 2004 Buker decided that plaintiff should be terminated, Kronish agreed.
The December 6, 2004 Meeting at Davio’s
On Sunday, December 5, 2004, Buker left a message on plaintiffs home answering machine asking plaintiff to join him and Kronish for dinner at Davio’s restaurant in Cambridge the following evening. Prior to the meeting, Kronish had advised Buker of his agreement with plaintiff regarding six months’ notice prior to plaintiffs voluntary resignation, or his termination by the Bank. t
The participants’ respective versions of the December 6 meeting vary considerably.
Kronish and Buker maintain that the purpose of the meeting was not to give plaintiff notice of his termination, but to tell him that they wanted to discuss his “separation” from the Bank at some point in the future, and to engage in preliminary discussions with plaintiff about what the terms of such a separation might be. Their description of that meeting, and its purpose, is not credible — particularly in light of Buker’s earlier decision, and Kronish’s concurrence, that they no longer wanted plaintiff on the management team, and Buker’s communications with McCormick regarding the “when” of plaintiffs leaving the Bank, and their preliminary discussions designed to facilitate the retention of a new CFO upon plaintiffs departure.
The December 6 meeting was not, as Buker and Kronish maintain, the beginning of a discussion about how plaintiff would leave the Bank: it was a notice of his termination. Buker and Kronish delivered that message to plaintiff in a setting designed to soften the blow, in part to induce him to remain at the Bank for at least the first quarter of the new fiscal year, the worst time in the fiscal cycle during which to tty to break in a new CFO. The only discussion necessary following the December 6, 2004 notice of termination was that regarding the timing and terms of plaintiffs departure.
Nor was the termination for cause. The record reflects that, throughout his tenure at the Bank, plaintiff was a conscientious and capable CFO; rather, the decision to terminate his employment was a matter of choice by Buker, who had initially felt that plaintiff did not keep him sufficiently informed as to plaintiffs activities, who had personality differences with plaintiff, and who ultimately wanted a CFO who would be, in Buker’s view, more of a team player.
Considering all the evidence, including the parties’ conduct subsequent to the December 6, 2004 meeting, the Court credits plaintiffs account of the meeting, as follows.
At about 6 p.m. that Monday evening, plaintiff arrived at Davio’s to find Buker and Kronish standing at the bar. As he approached them, plaintiff noticed that Kronish looked at him oddly, prompting plaintiff to ask Kronish whether this was his six months advance notice that the Bank was making a change in its CFO. Kronish nodded, and suggested that they discuss it at dinner.
After they were seated, Kronish said that he and Buker had decided to make a change at the CFO level; that they appreciated plaintiffs years of service and his good work; *75 but that Buker was president, wanted his own team, and that plaintiff was not going to remain at the Bank.
Kronish then said that he and Buker wanted plaintiff to stay on to help with the transition to a new CFO, at least through April, and no later than June 2005. They mentioned to plaintiff particular projects they wanted him to work on in that period, including the year-end audit and a regulatory exam early in the new year.
Plaintiff said that he wanted to keep the SERP; Buker and Kronish assured him that it was his. They also discussed a severance package (two weeks’ pay for every year of service); plaintiffs company car; health insurance; the services of an executive search firm to assist plaintiff in finding new employment; and a joint message regarding how his termination would be characterized publicly by both sides. Plaintiff expressed his gratitude for his time working at the Bank, his understanding that Buker wanted his own team, and his willingness to assist in the transition. It was left that Buker and Kronish would draft a working paper outlining plaintiffs termination benefits.
The dinner meeting on December 6, 2004 lasted more than an hour.
As of December 6, 2004, plaintiff had worked for the Bank for nearly eleven years, and was fully vested in his SERP benefit. He was 57 years old.
Events Following the December 6, 2004 Meeting
In the weeks following the December 6 meeting, the parties conducted themselves in a manner consistent with the Bank’s having provided plaintiff with an unequivocal notice of his employment termination, with a departure date of not later than June 2005.
On December 8, 2004, Buker emailed McCormick to report on the meeting with plaintiff (“went very well. Pretty sure he anticipated the outcome.”) and expressing Buker’s hope of finding a replacement by March 1 or April 1. Ex. 35. When McCormick inquired about “when you want me to do anything” on that front, Buker responded that “you are ok to begin organizing your file, thoughts, position description . . . any candidate resumes that you already have on file, etc.” Buker also stated that on December 7 he had"inform[ed] the executive committee of the board . . ." Ex. 36.
In the days following the dinner meeting, plaintiff talked with Buker about the need to put together the working paper they had discussed, and also to analyze and decide how to report the change in CFO on the Bank’s financial statements for the year about to end. On December 21, plaintiff sent an email (Ex. 41) to Buker and Kronish, referring to their invocation of “our six month agreement,” and noting the importance of their providing him with the “working paper” they had agreed on December 6 to prepare “to finalize the details of my departure.” Plaintiff mentioned also the year-end disclosure and financial reporting requirements triggered by “the points you made at our Monday meeting . ..”
Shortly thereafter, plaintiff received from Buker a handwritten paper dated December 12, headed “Paul— Outline” (Ex. 40), setting out the Bank’s proposed package to plaintiff. (Buker had asked McCormick to vet the outline, and had received the latter’s comments on December 20.) The outline listed bullet points addressing: medical coverage; “SERP intact — unchanged from existing terms”; 2004 bonus; “end of employment dates . . . t/b determined by FTUB — no sooner than April 30 — no later than June 30 — includes 30 day overlap and transition period w/successor”; company car; severance package “calculated at 26 weeks = $65m total”; no retirement contribution matching by Bank for 2005; and repurchase of deferred compensation shares owned. After a brief discussion with Buker, who said that Kronish concurred in the terms listed, plaintiff concluded that the items were in line with what they had told him during the December 6 meeting.
Plaintiffs activities following the December 6 dinner meeting bespeak one who understands that he has received notice of termination. For example, he did not elect, as he was required to do in December 2004, to participate in the Bank’s employee stock participation plan for 2005; he arranged to change his health insurance coverage from the Bank’s to his wife’s employer’s health plan; he began to search for a new job, telling prospective employers that he would be available between April 30 and June 30; and he responded favorably to an invitation from a business associate at KPMG, Jim Engel, regarding starting a community bank in Charlotte, North Carolina. In addition, on December 28 he prepared a “Term Sheet” outlining his position on various items to be accomplished during the transition period, including treatment of the SERP “upon my termination date . . .” Ex. 42.
Buker and Kronish had reached their decision to terminate plaintiff, and had given him notice of termination at the December 6 meeting, with no understanding of the effect of the Bank’s termination of plaintiff on the Bank’s accounting for plaintiffs SERP. Awareness began to dawn toward the end of December, after plaintiff had advised Buker and Kronish that the 2004 financial statements, for the year ending December 31, would need to reflect an appropriate adjustment.
Buker and Kronish looked to the Bank’s accountants, Grant Thornton, to advise them regarding the effect of the Bank’s termination of plaintiff on the Bank’s accounting for plaintiffs SERP. Paul Pustorino, the Grant Thornton partner in charge of the Bank’s account, declined, saying he required calculations by the Bank upon which he could opine.
Consequently, Buker and Kronish asked plaintiff to provide initial calculations of the expected financial impact on the Bank arising from the termination, including the cost to the Bank of triggering the SERP benefit. On January 6, 2005, plaintiff provided Buker and Kronish with a rough cost analysis, in which plaintiff concluded that the Bank would have to re *76 lease its interest in the insurance policy, with an after-tax cost to the Bank of approximately $270,000.
On January 11 and 13, 2005, plaintiff repeated his request that he and Buker put his termination package in final form. On January 13, at 3:27 p.m., plaintiff emailed Buker: “Are we ready to finalize our agreement so I can book the journal entries and close the books of the Bank?... The operating system of the Bank will automatically close the books of the Bank on the 26th of January.” Ex. 104. Plaintiff was referring to booking his termination costs, without which the 2004 financial statements could not be completed and certified.
About half an hour later, Buker emailed Kronish that “I just sat and had a terrific conversation with Paul . . . and brought him ‘up to speed’ on all of our most recent conversations. He is a classic gentleman. We agreed that we would try to nail everything down when he returns from Hawaii in 10 days. (Jan. 24).”
On January 24, 2005, after plaintiff had returned from his vacation, he sent a memo to Buker and Kronish repeating that, “[a]s we discussed before, I believe that the termination of my SERP has to be reflected in 2004 ... As I indicated before, we have to close the books of the Bank today or tomorrow for the year-end 12/31 /04 . . . Instead of meeting tomorrow evening, is it possible to meet tomorrow morning after the Cash Management meeting so I can move forward on the various reports that have to be prepared .. .?” Ex. 105.
The “meeting tomorrow evening” to which plaintiff referred was a meeting about which Buker had sent plaintiff an email on January 18, while plaintiff was on vacation: “Subject: Tues, 1/25 Dinner Meeting — To continue our mutual discussions. 7pm, at Davios, in E. Cambridge.” On Monday, January 24 (plaintiffs first day back), Buker sent plaintiff a reminder email confirming “our dinner meeting tomorrow night.” Id.
At some point between receiving plaintiffs initial calculations, on January 6, thathis termination would require an after-tax cost to the Bank of approximately $270,000, and Buker’s January 18 email to plaintiff inviting him to a second dinner meeting at Davio’s on January 25, Buker and Kronish concluded that they had made a costly mistake in giving plaintiff his six-month notice of termination on December 6. Accordingly, they scheduled the January 25 dinner meeting to attempt to rectify that mistake.
The January 25, 2005 Meeting at Davio’s
Plaintiff arrived at Davio’s expecting to conclude discussions about his termination package, and about the manner in which his termination would be reflected in the Bank’s year-end financial statements. Instead, when he arrived at the table where Buker and Kronish were already seated, Kronish told him that they had made a “terrible mistake,” that they had done something wrong, and did not want plaintiff to leave the Bank. Plaintiff, stunned, asked whether they were “unterminating” him. Kronish responded that they did not want him to leave; that the cost of his leaving was not what they had expected; was “too much”; and that they did not want to spend the money.
Plaintiff was shaken and angry at this news, and, after excusing himself to collect his thoughts and emotions, returned to the table and told Buker and Kronish that he did not want “this ever to happen again”; that they must put in writing that he would not be fired; and that the SERP would be his “no matter what.” Buker and Kronish responded that they would put in writing what plaintiff had requested, and that they wanted to rebuild his “trust.” Their discussion lasted less than half an hour, after which plaintiff left without dining.
Events Following the January 25, 2005 Meeting
In view of the Bank’s admission on January 25, 2005 that it had given plaintiff notice of termination on December 6 without understanding the financial consequences, and now wished to reverse that decision, it is unnecessary to make detailed findings regarding subsequent events. Plaintiff, having received his six-months notice of termination on December 6, thereafter altered his conduct and made personal, financial, and career choices (some of which are discussed above) in reliance on that notice. Moreover, at no time after December 6, 2004, did plaintiff agree to any arrangement with the Bank that affected plaintiffs rights under the 1999 SERP upon his termination by the Bank without cause. See, for example, his proposal to Buker and Kronish dated January 28, 2005 (Ex. 106). Nor did the Bank’s treatment of plaintiff after December 6, 2004, including its allocation of responsibilities to him, support any interpretation other than that plaintiff was cleaning up financial and other matters which the Bank needed to have him resolve before his departure date.
Plaintiff s last day of employment was June 6, 2005, pursuant to the Bank’s December 6, 2004 six-month notice of termination without cause.
On June 7, 2005, plaintiff, through counsel, wrote to Benmark, the entity designated in the SERP to receive requests for claims forms and other claim information in connection with any request for benefits. Counsel’s letter notified Benmark of the termination without cause, and asked Benmark to make the calculations necessaiy for plaintiff to exercise his termination rights.
On June 9, 2005, the Bank’s counsel wrote to Benmark that plaintiffs counsel’s letter should have been directed to the Bank, and instructed Benmark to take no action with respect to plaintiffs request. Benmark declined to provide plaintiff with the information his counsel had requested.
As of June 2005, the cash surrender value of the life insurance policy was $852,780.
As of June 2005, the average of plaintiffs last three years of base salary was $129,884.
As of June 2005, the Bank had made equal annual premium payments for ten years, totaling $713,620. The Bank’s interest in the premium was recorded on its books *77 as a receivable, calculated at present value assuming premium repayment until plaintiff reached 65. The Bank’s interest was valued in the 2004 annual financial statement, as of December 31, 2004, at $447,729.
The Bank’s Severance Policy
On June 27, 2003, the board’s Compensation Committee reviewed a document titled “Severance Policy Highlights — Effective July 1, 2003.” The document states that “[t]he severance policy” is designed “to provide financial compensation to any bank employee who is terminated involuntarily, other than for cause, from their position. An employee who has completed a twelve month period of service will be eligible to participate in the plan.” The document states also that “[a]ll employees will receive 2 weeks of severance for each year of service” (emphasis in original) subject to “minimum/maximum rules” set forth in a chart. Ex. 172.
At its June 27, 2003, meeting, the Compensation Committee “agreed to establish the [severance] policy on a discretionary, case by case basis.” Id. Doreen Heath, a senior vice president and the Bank’s director of human resources, was present at the meeting, following which she distributed the “Highlights” document to senior Bank officers, including plaintiff. When she did so, she told plaintiff and other recipients that the Bank would use the document as “guidelines,” reflecting the “case-by-case” decision of the Compensation Committee. Heath testified, and the Court concludes, that the Committee adopted the severance provisions as guidelines only, so as to avoid what the Committee members understood would be ERISA requirements triggered by adoption of a formal severance policy.
The Bank’s “Employee Handbook” in effect prior to June 2005 did not contain provisions for severance payments.
RULINGS OF LAW
The Court makes the following rulings.
Count II: “Recovery of Benefits Under the Terms of the SERP Agreement”
The ERISA statute, at 29 U.S.C. §1132(a)(1)(b), provides that a participant or beneficiary may bring a civil action to “recover benefits due to him under the terms of his plan, [and] to enforce his rights under the terms of the plan. . .” Section 1132(e)(1) provides that “[s]tate courts of competent jurisdiction” shall have concurrent jurisdiction with United States District Courts of such actions. Section 1132(g)(1) provides that “the court in its discretion may allow a reasonable attorneys fee and costs of action to either party.”
As noted above, the Court has previously concluded as a matter of law, as to Count I, that “the Amended SERP is an ‘unfunded’ ERISA plan,” and therefore is not enforceable unless plaintiff prevails at trial in proving that he was terminated without cause. Order on Plaintiffs Motion for Partial Summary Judgment on Count One, dated June 13,2006 (Gants, J.). Count II is based upon the theory of termination without cause, and seeks recovery, under ERISA, 29 U.S.C. § 1132 (a) (1) (b), of benefits under the terms of the SERP.
Because plaintiff has prevailed at trial on his claim that the Bank terminated him without cause, the Court must now analyze the terms of the SERP to determine what benefit is due plaintiff thereunder.
Plaintiffs benefit under the SERP is governed by the SERP and the ESCIA.
The ESCIA’s pertinent provisions may be summarized as follows (references are to numbered paragraphs of the ESCIA).
Paragraph I. Plaintiff, the insured, has purchased from Alexander Hamilton Life Insurance Company, prior to the effective date of the (amended) ESCIA, a “Flexible Premium Adj. Life Insurance” policy, with an initial face value of $1,147,416.
Paragraph II. The Bank “shall pay the premium ... while [plaintiff] remains employed by the Bank, and the policy remains in force, which premium as of the date hereof, is $71,362.00 per annum.” The Bank’s obligation is “[s]ubject to para. VI herein,” which as noted below gives plaintiff, upon retirement or termination “for any reason,” the option either to purchase the Bank’s interest in the policy or to assign complete ownership in the policy to the Bank.
Paragraph III. (“Bank’s Ownership Interest”) “Except as otherwise provided in Paragraph IV [’The Executive’s Ownership Interest’],” the Bank “shall have an ownership in the policy and its cash value and death benefit in an amount equal to the aggregate toted premiums it has paid.” There is no dispute in this case that the Bank paid a total of $713,620.
Paragraph IV. (“The Executive’s Ownership Interest”) “Subject to the Bank’s ownership interest in the policy described in Paragraphs III and v. [’Ownership Exceptions’] herein, the Executive shall have all remaining incidents of ownership in the policy, provided that as long as the Executive remains an employee of the Bank, the Executive shall vest [at a rate of 20% per year for five years, which means that plaintiff is 100% vested] in his .. . ownership interest in any cash value in excess of the Bank’s interest. . . Upon the Executive’s termination of employment with the Bank he . .. shall be permanently [and 100%] vested . . . ,” with exceptions not here relevant. Thus, on June 6, 2005, plaintiffs ownership of the policy, in excess of the Bank’s interest ($713,620) was fully vested, and the cash surrender value of the policy was $852,780. Accordingly, on June 6, 2005, plaintiffs ownership interest in the policy equaled $139,160.
Paragraph V. Plaintiff shall not “surrender or cancel the policy or borrow or withdraw funds from or against the policy as long as the Bank’s ownership interest exists.” Because (1) the Bank’s ownership interest exists unless and until plaintiff exercises his option under para. VI to purchase the Bank’s interest, (2) the Court has extended the option deadline to a date 90 days after its decision in this case, and (3) plaintiff has *78 not exercised the option to date, plaintiff has no present right to borrow against the policy.
If and when plaintiff exercises his option to purchase the Bank’s interest under para. VI, para. v. further provides that plaintiff may purchase the Bank’s interest “by paying to the Bank an amount of money equal to the premiums it has paid to that time” (plus additional amounts due in circumstances not present here). In that event, he “shall have the right to borrow against or withdraw from the policy but only for the purpose of purchasing the Bank’s interest.” If plaintiff were to exercise his right to purchase the Bank’s interest, the Bank would have “no further interest in either the policy’s cash value or death benefit,” and plaintiff “shall have all rights to the policy, including any cash value in excess of that used to fund [his] purchase of the Bank’s ownership interest.”
Thus, under para. V, plaintiff may not borrow against the policy so long as the Bank’s ownership interest exists, except for the purpose of purchasing the Bank’s ownership interest under para. VI.
Paragraph VI. Within 90 days after plaintiff s retirement or termination of his employment “for any reason” (a period which, as noted above, the Court has extended), one of two things must occur: plaintiff may at his option (1) “either purchase the Bank’s interest in the policy in the manner set forth in Paragraph v. herein,” or he may (2) assign and transfer complete ownership in the policy to the Bank." If plaintiff fails to make an election, he is deemed under para. VI to have elected the latter option.
The SERP’s pertinent provisions may be summarized as follows (references are to numbered sections oftheSERP).
Section 2.1. If, as the Court has determined, plaintiffs employment is terminated by the Bank without cause, then “the Bank shall release its interest in the policy which is the subject of the ESCIA, and the Participant’s interest therein shall be increased by a like amount, to the extent, if any, necessary so that the Policy Retirement Benefit determined at termination of employment equals the Targeted Retirement Benefit.” If the release of its entire interest to plaintiff would still not provide plaintiff with “a Policy Retirement Benefit equal to the Retirement Benefit,” the Bank nevertheless has no further liability to plaintiff. In other words, the Bank’s liability is capped at the amount of its “interest in the policy which is subject to the ESCIA”; under the ESCIA, as noted above, the Bank’s “ownership interest in the policy” is equal to the total premiums it has paid, i.e., $713,620.
Section 1.13 defines the ‘Targeted Retirement Benefit” (TRB) as “a monthly benefit payable for a period of 180 months commencing on the Participant’s Normal Retirement Date... equal to one twelfth of thirty percent (30%) of the Participant’s Final Average Three Year’s Compensation." Plaintiffs “Normal Retirement Date” is defined as the date he attains age 65, i.e., July 23, 2012. The parties agree that plaintiffs “Final Average Three Year’s Compensation” is $129,884, and that one twelfth of 30% of that amount equals $3,247.10 per month.
Thus, under Section 2.1, the Court must determine whether, and to what éktent, the Bank must release to plaintiff its ownership interest, so that the “Policy Retirement Benefit determined at termination of employment equals the Targeted Retirement Benefit”— i.e., will pay to plaintiff the equivalent of $3,247.10 per month for fifteen years commencing July 23, 2012. The question is not a simple one.
Section 1.12 defines the “Policy Retirement Benefit” (PRB) as follows:
“Policy Retirement Benefit” means the monthly benefit which is the taxable equivalent of the monthly benefit, payable for a period of 180 months and commencing on the Participant’s Normal Retirement Date . . . which may be provided from the Participant’s interest in the cash surrender value of the policy which is the subject of the ESCIA . . ., making maximum use of policy loans and other tax-free withdrawals and applying the interest crediting rate, loan interest rates, maximum marginal rates of tax and all other relevant factors as of the date of computation. For this purpose, “taxable equivalent” means that to the extent a monthly benefit from the Participant’s . . . interest in the policy may be provided through the use of policy loans or other tax-free withdrawals, the Policy Retirement Benefit is the greater, fully taxable, monthly benefit which, after payment of taxes at the maximum marginal rates of tax, would equal the monthly benefit payable on a tax-free basis from the policy. In determining the Policy Retirement Benefit, no premiums or other charges for insurance shall be assumed to affect the Participant’s interest in the policy.
The parties essentially agree that the taxable equivalent of the TRB which the PRB — determined, as required by Section 2.1, “at termination of employment” (June 6, 2005) — must equal is $5,439.[2] The question raised by the provision just quoted is whether the required payment stream of $5,439 to plaintiff for a period of fifteen years beginning on July 23, 2012, will be provided by plaintiffs “interest in the cash surrender value of the policy” ($139,160), and if not, then what amount must be released by the Bank under Section 2.1 to ensure that payment stream? The manner in which the amount necessary to provide the required payment stream is to be calculated is addressed in this portion of Section 1.12:
“Policy Retirement Benefit” means the monthly benefit which is the taxable equivalent of [the TRB] . . . making maximum use of policy loans . . . For this purpose, “taxable equivalent” means that to the extent a monthly benefit from the Participant’s . . . interest in the policy may be provided through the use of policy loans . . . , the [PRB] is the greater, fully taxable, monthly benefit which would equal the [TRB].
*79 The requirement that the PRB be calculated “making maximum use of policy loans,” to the extent a monthly benefit from the plaintiffs interest in the policy “may be provided” through the use of such loans, presupposes that such loans are permitted under the ESCIA and the policy itself. While the policy permits plaintiff, as the “owner,” to borrow against the policy,[3] as noted above the ESCIA prohibits plaintiff from taking such loans so long as the Bank’s ownership interest exists, except for the purpose of purchasing the Bank’s ownership interest under para. VI. At present, then, neither party may borrow against the policy; that restriction will change only when plaintiff exercises the election imposed on him by para. VI of the ESCIA, which as noted above he must exercise, pursuant to the Court’s August 2, 2005 Order, within a 90-day period commencing when Court makes a final decision as to whether the plaintiff was terminated without cause or voluntarily resigned.
Because Section 2.1 requires an adjustment between the Bank’s and plaintiffs respective interests in the policy, the calculation of that adjustment must be made prior to the election required by para. VI of the ESCIA, after which either the plaintiff or the Bank will own 100% of the interest in the policy. In the circumstances of this case where plaintiff has made no election, and therefore neither party may borrow against the policy, the provisions of Section 1.12 requiring calculation of the PRB using the “maximum use of policy loans,” to the extent such loans may provide any monthly benefit, do not apply. Rather, the pertinent requirement of Section 1.12 is that which defines the PRB as the “taxable equivalent” of the TRB. The question posed by that requirement is: what amount, as of June 6, 2005, will yield the TRB payment to plaintiff of $3,247 per month (after taxes) over the specified period? The answer will determine the amount of its interest in the policy which the Bank must release to plaintiff under Section 2.1.
That answer requires a determination of the present value of the PRB required by Section 2.1, i.e., the present value, as of June 6, 2005, of an income stream comprising 180 monthly payments of $5,439. Defendant’s expert, Arthur F. Warren (employing a monthly payment amount of $5,412, as noted above) has calculated the present value of that income stream as $501,006, assuming an actuarially determined conversion factor at age 65, and an underlying discount rate of 4.86%. The parties have stipulated that, if a combined federal and state income tax rate of 40.3% is assumed, rather than the 40% assumed by Warren, Warren’s calculation of present value is changed to $503,444.
The 4.86% discount rate which Warren utilized reflects the IRS statutory discount rate, as of December 2004, employed to calculate minimum lump-sum payment amounts in qualified retirement plans for lump sums made in 2005. After reviewing that rate and the other rates to which the parties’ experts testified, including the 30-year Treasury rate in effect in June 2005 (4.29%), and the Pension Benefit Guaranty Corporation’s Immediate Annuity Rate for June 2005 (2.50%), the Court concludes that the appropriate discount rate is 4.29%. That is the rate at which the target PRB sum, conservatively invested in 30-year Treasuries in June 2005, would on plaintiffs 65 th birthday provide him the required stream of monthly payments.
Accordingly, the Court calculates the amount of the Bank’s interest in the policy which it was required to release to plaintiff on June 6, 2005, per Section 2.1, as follows. The annual value of monthly payments of $5,439 (the PRB) is $65,268. That annual value is multiplied by 10.75243, the agreed actuarially determined conversion factor at age 65. The result, $701,790, is then divided by 1.34183, which is the sum of one and 4.29%, raised to the seventh power, which represents the seven yeans between the 2005 termination date and the 2012 date on which payments are to begin. The resulting present value is $523,010.
The SERP therefore requires that the Bank’s interest in the $852,780 cash value of policy be reduced as of June 6, 2005 by $523,010, from $713,620 to $190,610, resulting in a corresponding increase in plaintiffs interest by $523,010 as of that date, from $139,160 to $662,170.
The Court concludes that an award of attorneys fees and costs to plaintiff is appropriate, and will consider a fee petition, suitably supported by affidavit, and any opposition thereto.
Count III: “Recovery of Severance Benefits”
The Court has found that the Bank adopted the “severance policy” reflected in the “Highlights” handout (Ex. 172), as a guideline only, not as a formal Bank policy, so that the Bank could consider severance on a case-by-case basis. Accordingly, there was no entitlement in plaintiff to severance in the circumstances of this case.
Plaintiff relies on Simas v. Quaker Fabric Corp. of Fall River, 6 F.3d 849 (1st Cir.1993), for the proposition that, even in the form found by the Court, the severance policy is an employee benefit plan protected by and enforceable under ERISA.[4]
The question before the court in Simas was whether the Massachusetts “tin parachute” statute, G.L.c. 149, §183, adopted as an anti-takeover measure requiring severance payments for employees whose employers are bought by other companies, was preempted by ERISA. The specific question before the court was whether the state-imposed severance benefit constituted a “plan” under ERISA. The court concluded that it was, insofar as it imposed administrative obligations on the employer beyond merely requiring the employer to write a check. Such obligations on the company supported the court’s conclusion that the state statute was a “plan,” and that “a state statute that obligates an employer to establish an employee benefit plan is itself preempted even though *80 ERISA itself neither mandates nor forbids the creation of plans.” Id., at 852.
Plaintiff argues that “[w]here, as here, a severance policy requires individualized determinations of eligibility and benefit levels and contemplates ongoing administration, the arrangement is an employee benefit plan protected by ERISA,” citing Simas. Plaintiffs Trial Memorandum, at 18. The problem with that argument is that, in Simas, the employer was obligated (there, by state law) to provide the severance benefit; the question was whether the state requirement constituted a “plan” under ERISA. The court concluded that, because the employer was obligated not only to make the payment but to administer it in some degree over time, the statutoiy obligation was a “plan.” Here, plaintiff has established no obligation to pay the severance benefit under any circumstances, and so has failed to prove the predicate upon which the Simas decision was founded. Accordingly, Count III must fail.
Count IV: “Declaratory Judgment”
For the reasons stated above, plaintiff is entitled to a declaration (a) that the Bank terminated his employment without cause, and that as a result he is entitled to the retirement benefit provided in the SERP, and (b) that, to provide the retirement benefit, the Bank must release $523,010 of its interest in the policy.
Count V: “Breach of Contract/Estoppel”
For the same reasons, the Court concludes that the Bank has breached the contract which comprises the SERP and the ESCIA. The benefit of the bargain, under the terms of the SERP as set forth above, is identical to the relief as to which plaintiff seeks declaratory judgment.
Count VI: “Breach of the Implied Covenant of Good Faith and Fair Dealing”
In Massachusetts, there is an implied covenant of good faith and fair dealing between the parties to a contract. The covenant means that neither party may do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract, Anthony’s Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 471-72 (1991), and that, when performing the obligations of the contract, the parties “remain faithful to the intended and agreed expectations” thereof, Uno Restaurants, Inc. v. Boston Kenmore Realty Corp., 441 Mass. 376, 385 (2004). A breach occurs when one party violates the reasonable expectations of the other. Id. See Eigerman v. Putnam Investments, Inc., 450 Mass 281, 287-88 (2007).
Here, as the Court has found, the Bank, through the actions of Buker and Kronish, gave plaintiff his notice of termination without cause on December 6, 2004, and thereupon became liable under the SERP to take specified actions to ensure that plaintiff would receive his promised retirement benefit. Unbeknownst to Buker and Kronish, the notice of termination also set in motion what they subsequently learned was a serious adverse accounting charge against the Bank. Rather than allow the Bank to suffer the consequences of their mistake by honoring the terms of the SERP, Buker and Kronish decided to block plaintiffs attempts to claim his SERP benefit, and to deny him the necessary release of the Bank’s interest in the policy. The Bank’s conduct clearly had the effect of injuring plaintiffs rights to his SERP benefit, and violated his reasonable expectations.
The parties’ respective requests for findings and rulings, to the extent contrary to the foregoing, are denied.
ORDER FOR JUDGMENT
For the reasons stated above, it is hereby ORDERED, DECLARED, AND ADJUDGED as follows.
1. Judgment shall enter in favor of plaintiff Paul Dougovito on Counts II, IV, V, and VI of the First Amended Complaint, and in favor of defendant First Trade Union Bank on Counts I and III thereof.
2. Defendant terminated plaintiffs employment without cause; therefore, plaintiff is entitled to the retirement benefit provided in the SERP Agreement, as amended in 1999. To that end, defendant is required under the terms of the SERP to release $523,010 of its interest in the life insurance policy.
3. Plaintiff is entitled to an award of attorneys fees and costs under 29 U.S.C. §1132(g), in an amount to be determined upon a petition therefor.
4. The foregoing constitutes the Court’s “final decision as to whether the plain tiff was terminated without cause or unilaterally resigned,” for purposes of the commencement of the 90-day period addressed in the Court’s August 2, 2005 Order on Plaintiffs Motion for Preliminary Injunction. Accordingly, that 90-day period commences on the date indicated below.

The Court previously denied plaintiffs motion for partial summary judgment as to Count I, “Recovery of SERP Benefits Protected by ERISA,” wherein plaintiff alleged that the SERP is a “funded" plan under ERISA, and therefore that he is entitled to the SERP benefits regardless of whether his termination was voluntary or involuntary. See Order dated June 13, 2006 (Gants, J). The Court concluded that the SERP is an unfunded plan, and that, “as a matter of law, in the context of this litigation, Dougovito’s entitlement to full Retirement Benefits depends on his prevailing at trial in proving that he was terminated without cause.” Id., at 8.

Plaintiffs figure, calculating the taxable equivalent of the $3,247.10 TRB at a marginal tax rate of 40.3% (35% marginal federal rate, plus 5.3% Massachusetts rate). The Bank, using a combined marginal rate of 40%, calculates the taxable equivalent as $5,412.

the policy, at 5 (“Definitions”), defines “owner” as the person “named on the attached application,” i.e., plaintiff. At page 10, the policy specifies that “you” (defined as the “owner”) “may receive a loan up to the amount of the Cash Value” of the policy. Thus, the policy presently permits plaintiff, but not the Bank, to receive such a loan.

Plaintiffs also cite ERISA, 29 U.S.C. §1002(1)(B); that section, referring to “any benefit described in section 186(c) of this title," does not include severance payments in the present context.